PER CURIAM.
Richard Lynch appeals an amended order of the Circuit Court of the Eighteenth Judicial Circuit denying his postconviction motion to vacate his convictions and corresponding sentences of death and life imprisonment. Lynch also petitions this Court for a writ of habeas corpus. We possess jurisdiction to resolve these claims. See art. V, § 3(b)(1), (9), Fla. Const. As explained in our analysis, we affirm the amended order of the postconviction court and deny each of Lynch’s claims. Furthermore, we deny Lynch’s habeas petition.
I. BACKGROUND
On October 19, 2000, Richard Lynch pled guilty to two counts of first-degree premeditated murder,[1] one count of armed burglary of a dwelling, and one count of armed kidnapping.[2] See Lynch v. State, 841 So.2d 362, 365-66 (Fla.2003). These *53 charges arose from the March 5, 1999, deaths of Roseanna Morgan, a woman with whom Lynch had engaged in a “long affair,” and her thirteen-year-old daughter, Leah Caday. Id. at 366. The trial court imposed death sentences for both murders and life imprisonment for the burglary and kidnapping charges. See id. at 368. On direct appeal, we detailed the facts surrounding the murders:
The testimony elicited ... included a tape of a telephone call that appellant made to the “911” emergency assistance service while still in the apartment where the murders occurred. On that tape, Lynch is heard admitting to the 911 operator that he shot two people at 534 Rosecliff Circle. He said he initially traveled to the apartment only to attempt to have Morgan pay a credit card debt, but resorted to shooting her in the leg and in the back of the head. He told the 911 operator that he had three handguns with him and that he shot Morgan in the back of the head to “put her out of her misery.” Appellant also admitted to firing at the police when they first arrived on the scene.
As to Caday, appellant informed the 911 operator that he had held Caday at gunpoint while waiting for Morgan to return home. He related that she was terrified during the process prior to the shootings and asked him why he was doing this to her. Appellant admitted that he shot Caday, and said “the gun just went off into her back and she’s slumped over. And she was still breathing for awhile and that’s it.” Appellant told the operator he planned to kill himself.
During the course of these events on March 5, 1999, appellant telephoned his wife three times from the apartment. His wife testified that during the first call she could hear a woman screaming in the background. Appellant’s wife further testified that the screaming woman sounded “very, very upset.” When Lynch called a second time, he admitted to having just shot someone.
Prior to being escorted from the apartment by police, Lynch also talked to a police negotiator. The negotiator testified that Lynch told her that during the thirty to forty minutes he held Ca-day hostage prior to the shootings, Ca-day was terrified, he displayed the handgun to her, she was aware of the weapon, and appeared to be frightened. He confided in the negotiator that Ca-day had complied with his requests only out of fear. Finally, appellant described the events leading to Morgan’s death by admitting that he had confronted her at the door to the apartment, shot her in the leg, pulled her into the apartment, and then shot her again in the back of the head.
Several of Morgan’s neighbors in the apartment complex also testified as to the events of March 5, 1999. Morgan’s neighbor across the hall testified that she looked out of the peephole in her door after hearing the initial shots and saw Lynch dragging Morgan by the hands into Morgan’s apartment. She further testified that Lynch knocked on the door to Morgan’s apartment and said, “Hurry up, open the door, your mom is hurt.” The neighbor testified that Morgan was screaming and was bloody from her waist down. Morgan’s neighbor further testified that the door was opened, then after entering with Morgan, Lynch closed the door and approximately five minutes later she heard the sound of three more gunshots. A second neighbor in the apartment complex also testified that approximately five to seven minutes after she heard the initial gunshots, she heard three more.
Id. at 366-67 (footnote omitted).
In imposing death sentences for the murders, the trial court found three aggra *54 vating factors as to the murder of Morgan: (1) the murder was cold, calculated and premeditated (CCP) (great weight); (2) Lynch had previously been convicted of a prior violent felony (the murder of Caday) (moderate weight); and (3) the murder was committed while Lynch was engaged in one or more other felonies (little weight).[3] See id. at 368. As to the murder of Caday, the trial court also found three aggravating factors: (1) the murder was heinous, atrocious, or cruel (HAC) (great weight); (2) Lynch had previously been convicted of a prior violent felony (the murder of Morgan) (great weight); and (3) the murder was committed while Lynch was engaged in one or more other felonies (moderate weight). See id. With regard to mitigation, the trial judge found one statutory mitigator and eight nonstat-utory mitigators:
The statutory mitigating factor found was that Lynch had no significant history of prior criminal activity (moderate weight). The eight nonstatutory mitigators were: (1) the crime was committed while defendant was under the influence of a mental or emotional disturbance [but the disturbance was not extreme] (moderate weight); (2) the defendant’s capacity to conform his conduct to the requirements of law was impaired [but not severely impaired] (moderate weight); (3) the defendant suffered from a mental illness at the time of the offense (little weight); (4) the defendant was emotionally and physically abused as a child (little weight); (5) the defendant had a history of alcohol abuse (little weight); (6) the defendant had adjusted well to incarceration (little weight); (7) the defendant cooperated with police (moderate weight); (8) the defendant’s expression of remorse, the fact that he has been a good father to his children, and his intent to maintain his relationship with his children (little weight).
Id. at 368 n. 5.
A. Direct Appeal
On direct appeal, Lynch raised the following issues: (1) the trial court erred in finding the HAC aggravator as to the murder of Caday and the CCP aggravator as to the murder of Morgan; (2) the sentencing order was unclear with regard to the findings of the mental-health mitigators, and this Court was required either to construe the findings as statutory mitigators or remand to the trial court for clarification; (3) the death sentences were disproportionate; and (4) Florida’s death-penalty scheme is unconstitutional on its face and as applied. See id. at 368-379. We denied relief as to all claims and affirmed Lynch’s convictions and sentences. See id. at 379. The United States Supreme Court denied Lynch’s petition for writ of certiorari on October 6, 2003. See Lynch v. Florida, 540 U.S. 867, 124 S.Ct. 189, 157 L.Ed.2d 123 (2003).
B. Rule 3.851 Postconviction Proceedings
On July 27, 2004, Lynch filed a rule 3.851 motion for postconviction relief with the circuit court raising the following issues and sub-issues: (1) Guilt-phase ineffective assistance of counsel — (a) failure to move to dismiss count three of the indictment (armed burglary of a dwelling), (b) failure to advise Lynch of potential defenses to the charged offenses, (c) failure to advise Lynch that his guilty plea automatically established certain aggravators (contemporaneous violent felonies — murder, kidnapping, and armed burglary), (d) fail *55 ure to advise Lynch of mitigation prior to entering a guilty plea due to a failure to investigate, (e) failure to suppress evidence seized from Lynch’s home, (f) failure to consult a firearms expert concerning the Glock G30 .45-caliber, semi-automatic pistol’s “hair trigger” and lack of a manual safety, (g) failure to investigate the relationship of Greg Morgan (the estranged husband and stepfather of the victims), Roseanna Morgan, and Leah Caday as to each other and as to Lynch (Lynch withdrew this claim before the postconviction hearing), (h) failure to advise Lynch of the confidential-marital communications privilege and its relevance to Lynch’s murder-suicide letter and his phone conversations with his wife, Virginia Lynch, (i) failure to ensure an adequate factual basis as to the charged offenses; (¾) Penalty-phase ineffective assistance of counsel — (a) failure to advise Lynch concerning his waiver of a penalty-phase jury, (b) failure to conduct an appropriate mitigation investigation and failure to present potentially dispositive mitigation, (c) failure to ensure a competent, appropriate mental-health evaluation, (d) failure to suppress evidence seized from Lynch’s home, (e) failure to present an accidental-discharge defense and failure to adequately cross-examine the State’s firearms expert (Nanette Rudolph), (f) failure to investigate the relationship of Greg Morgan, Roseanna Morgan, and Leah Ca-day as to each other and as to Lynch (Lynch withdrew this claim before the postconviction hearing), (g) failure to file a motion to suppress the murder-suicide letter and Lynch’s phone conversations with his wife based upon the confidential-marital communications privilege, (h) failure to effectively cross-examine the State’s mental-health expert (Dr. William Riebsame), (i) cumulative error; (3) Incompetent mental-health assistance: Lynch was deprived of his due-process right to develop factors in mitigation because the appointed psychiatrist failed to conduct the appropriate tests for organic brain damage and mental illness; (I) Alleged Brady[4] violations; (5) Alleged Giglio[5] violations; (6) Reassertion of guilt-phase ineffectiveness contention that Lynch’s plea was involuntary; (7) The State’s loss or destruction of exculpatory evidence (Lynch withdrew this claim before the postconviction hearing); (8) Newly discovered evidence renders the opinion of the State’s mental-health expert unreliable; and (9) Cumulative error.
The State filed a response and an amended response to Lynch’s rule 3.851 motion. The postconviction court, which was also the trial court, granted an eviden-tiary hearing for all claims except those that Lynch voluntarily withdrew. The court later held a rule 3.851 hearing from July 25-30, 2005. On April 3, 2006, the postconviction court denied relief as to all claims. On April 10, 2006, the court entered an amended order denying relief and an order clarifying the order entered on April 3, 2006.
On April 13, 2006, in response to the statement in the April 10th postconviction order that “the Court took the time to inspect the [Glock G30] in chambers, and the trigger pull is not even close to being a ‘hair trigger,’ ” Lynch filed a motion to disqualify the postconviction judge. Lynch premised his motion on Florida Rule of Judicial Administration 2.160,[6] section 38.10, Florida Statutes (2006), and Canon 3E(1) of the Code of Judicial Con *56 duct. Specifically, he asserted that “[t]he Court test-fired the [Glock G30] in chambers, presumably without bullets, ... to determine the trigger pull of the gun. This testing was done ex parte, without notice to counsel.” Lynch thus concluded that the postconviction court “made itself an expert material witness for the State in these proceedings,” was consequently biased, and should have recused itself.
The State responded on April 19, 2006, contending that (1) the postconviction court, as the trier of fact during both the penalty phase and the postconviction hearing, had the right to inspect materials in evidence (the Glock G30 was unquestionably in evidence and the postconviction court took judicial notice of the trial proceedings in their entirety); (2) the judge had not conducted an “ex parte testing” because counsel for the State was not present (instead, this was an “in camera inspection”); and (3) the postconviction court was not a “material witness” because both parties’ firearms experts had previously testified concerning the trigger pull of the weapon. On April 21, 2006, the postconviction court denied Lynch’s motion to. disqualify as “legally insufficient.” Lynch then filed an emergency petition for writ of prohibition with this Court. On July 11, 2006, we denied this petition without prejudice to enable Lynch to raise this issue along with others during his postcon-viction appeal.
On October 9, 2006, the postconviction court issued a second amended order denying Lynch’s rule 3.851 motion and denying rehearing, in which it addressed Lynch’s judicial-bias claim. The court interpreted our denial of Lynch’s petition for writ of prohibition as a signal that it was free to address the merits of this bias claim. The postconviction court concluded that it had not “tested” the gun and that it had not acted as a material witness; rather, the court, as the factfinder, simply examined a piece of evidence in chambers and corroborated the claims of the relevant experts that the trigger pull of this particular Glock G30 fell within the normal range.
C. Habeas Corpus
On July 3, 2007, Lynch filed a petition for writ of habeas corpus with this Court challenging the legality of his confinement under the United States and Florida Constitutions. Lynch asserts four separate habeas claims.1
We address each of Lynch’s rule 3.851 and habeas claims below.
II. ANALYSIS
A. Guilt-Phase Ineffectiveness
Lynch first alleges that trial counsel were ineffective during the guilt phase of his capital proceeding. With regard to such ineffectiveness claims, we employ a mixed standard of review, through which we defer to the circuit court’s factual findings so long as they are supported by competent, substantial evidence, but review its legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004). Under this standard, there is a strong presumption that trial counsel performed effectively. See Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, “the defendant bears the burden of proving that counsel’s representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy.” State v. Williams, 797 So.2d 1235, 1238 (Fla.2001) (citing Jones v. State, 732 So.2d 313, 319 (Fla.1999)).
We explained the standard for guilt-phase ineffectiveness claims with regard to pleas in Grosvenor v. State, 874 So.2d 1176 (Fla.2004). First, the defendant must specifically identify acts or *57 omissions of counsel that were manifestly outside the wide range of reasonably competent performance under prevailing professional norms. See id. at 1179 (citing Strickland, 466 U.S. 668, 104 S.Ct. 2052 (1984); Hill v. Lockhart, 474 U.S. 52, 58-59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). Second, “[a] defendant who has pleaded guilty who claims that defense counsel was ineffective for failing to advise of an available defense establishes Strickland’s prejudice prong by demonstrating a reasonable probability that, but for counsel’s errors, the defendant would not have pleaded guilty and would have insisted on going to trial.” Grosvenor, 874 So.2d at 1181. “Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Under the second prong of this test,
[i]t is not necessary for the defendant to show that he actually would have prevailed at trial, although the strength of the government’s case against the defendant should be considered in evaluating whether the defendant really would have gone to trial if he had received adequate advice from his counsel.
Grosvenor, 874 So.2d at 1181 (quoting Miller v. Champion, 262 F.3d 1066, 1069 (10th Cir.2001)). We will consider
the totality of the circumstances surrounding the plea, including such factors as whether a particular defense was likely to succeed at trial, the colloquy between the defendant and the trial court at the time of the plea, and the difference between the sentence imposed under the plea and the maximum possible sentence the defendant faced at a trial.
Grosvenor, 874 So.2d at 1181-82.
Having established the applicable standards, we address each of Lynch’s guilt-phase ineffectiveness subclaims below. We find that in the face of overwhelming evidence of guilt, trial counsel made the reasonable strategic determination that this was purely a penalty-phase case and that the soundest means of avoiding the imposition of a death sentence was to concentrate on presenting compelling mitigation evidence.
i. The Charged Offenses
Lynch contends that his trial counsel did not properly research and inform him of the elements of, and defenses to, armed burglary, kidnapping, and first-degree murder and that, but for these errors, he would not have pled guilty. We disagree and, instead, find that trial counsel properly advised Lynch.
Based on the nature of the crimes Lynch committed, and the fact that he confessed on at least three occasions, trial counsel believed that this was purely a sentencing case. Therefore, lead trial counsel, James E. Figgatt, in conjunction with co-counsel, Timothy Caudill, made a strategic decision to recommend that Lynch plead guilty and concentrate on mitigating his culpability for these offenses during the ensuing penalty phase. Counsel were particularly concerned with exposing Lynch to a jury because this case involved a thoroughly planned double murder of a mother and her thirteen-year-old minor daughter (although the murder of the daughter was an unintended, felony murder). During the postconviction hearing, Mr. Figgatt testified that he reviewed the indictment for defects and that he discussed possible defenses with Lynch before he pled guilty. Second-chair trial counsel, Mr. Caudill, did not believe that the facts of this case reasonably supported any theoretical defenses because Lynch had confessed to his actions during (1) a thirty- to forty-minute recorded conversa *58 tion with a 911 dispatcher, (2) a discussion with a police negotiator, and (3) a videotaped confession (although Lynch characterized the murders as “accidental”). In Caudill’s mind, the facts of this case were wholly inconsistent with accidental discharge, Lynch’s actions supported a kidnapping charge, and the testimony of a neighbor — who lived directly across the hall from the victims — was extremely damaging to any burglary defense. As we stated on direct appeal, the neighbor
testified that she looked out of the peephole in her door after hearing the initial shots and saw Lynch dragging Morgan by the hands into Morgan’s apartment. She further testified that Lynch knocked on the door to Morgan’s apartment and said, “Hurry up, open the door, your mom is hurt.” The neighbor testified that Morgan was screaming and was bloody from her waist down. Morgan’s neighbor further testified that the door was opened, then after entering with Morgan, Lynch closed the door and approximately five minutes later she heard the sound of three more gunshots.
Lynch, 841 So.2d at 367 (emphasis supplied).
Lynch hinges this guilt-phase ineffectiveness subclaim on his reading of the factual proffer Mr. Figgatt presented to the trial court during Lynch’s plea colloquy. In relevant part, Mr. Figgatt stated that Lynch
went to [Roseanna Morgan’s] new home ..., he approached her daughter [Leah Caday] who was coming home from school, he gained entry voluntarily into the home at that point in time [ (i.e., his initial entry) ]. Subsequently removed from a bag that he had, one of two or three firearms. And at that point in time the kidnapping ensues, as well as what we contend or what the State contends and we admit was, in essence, a burglary, because whatever consent he had to be there was gone. Subsequently, Ms. Morgan, ... arrived at her apartment, her home. She was met at the door, ... she had a heated discussion with [Lynch], and refused to come into the apartment with him there.... [Ms. Morgan] was shot on her front stoop or porch area in front of the apartment, and then pulled inside.... [Lynch] shot [Morgan] with more than one of the guns that he brought.... Ms. Caday either went to her mother or attempted to leave and got in the way of the shooting and she was shot one time and she died.... While [Lynch] was there he called the Sanford Police Department or 911 and got the Sanford Police Department dispatcher, who remained on the line with him from thirty-five to forty-five minutes. There is no issue 'of fact.
(Emphasis supplied.) Based on his reading of the proffer, Lynch contends that counsel and the trial court failed to comply with Florida Rule of Criminal Procedure 3.172(a), which states that “[b]efore accepting a plea of guilty or nolo contendere, the trial judge shall determine that the plea is voluntarily entered and that a factual basis for the plea exists. Counsel for the prosecution and the defense shall assist the trial judge in this function.” (Emphasis supplied.) Lynch asserts that trial counsel rendered ineffective assistance because the factual proffer did not legally support his convictions for first-degree murder, armed burglary, or kidnapping, and that this deficient performance constitutes fundamental error.

a. First-Degree Murder

We find no deficiency with regard to the factual proffer as it addresses Lynch’s two first-degree murder convictions. The proffer, upon which the trial court relied in accepting Lynch’s plea, provided sufficient *59 factual support for each first-degree murder conviction. Cf. Williams v. State, 316 So.2d 267, 271-73 (Fla.1975); Fla. R.Crim. P. 3.172(a). According to the proffer, Lynch arrived at the victims’ apartment, held the daughter-victim (Leah Caday) hostage, and then subsequently shot and killed both victims after the mother-victim (Roseanna Morgan) arrived at the apartment. There was no deficiency. Lynch’s killing of Morgan was an intentional, premeditated first-degree murder, and his killing of Caday was both first-degree felony murder and first-degree murder under the doctrine of transferred intent. See § 782.04(1)(a)(1), Fla. Stat. (1999) (premeditated murder); Fla. Std. Jury Instr. (Crim.) 7.2 (defining “premeditation” and “transferred intent”); § 782.04(1)(a)(2)(o), Fla. Stat. (1999) (felony murder committed while engaged in the murder or attempted murder of another); Johnson v. State, 969 So.2d 938, 951 (Fla.2007) (“Premeditation can be inferred from circumstantial evidence such as ‘the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.’ ” (quoting Sochor v. State, 619 So.2d 285, 288 (Fla.1993))), cert. denied, — U.S. —, 128 S.Ct. 2056, 170 L.Ed.2d 799 (2008); Lee v. State, 141 So.2d 257, 259 (Fla.1962) (explaining our adherence to the doctrine of transferred intent).
However, even if we were to conclude that counsel performed deficiently with regard to the proffer, Lynch cannot demonstrate that he was prejudiced by this deficiency because both he and counsel were well aware that the State possessed the necessary evidence to prove his commission of these murders. The State submitted a competing written factual proffer, which was more explicit in describing the offenses Lynch committed on March 5, 1999. Trial counsel offered their factual proffer in the hope of softening some or all of the facts for purposes of the penalty phase. As Mr. Figgatt recognized during the postconviction hearing,
this was a sentencing case, this always was a sentencing case. When Mr. Lynch finished his thirty to forty-five minute conversation with the [911] dispatcher and the acts that were done were done, this was a sentencing case.... This was not a trial in the sense of guilt or innocence.
(Emphasis supplied.) The evidence and testimony presented during the penalty phase more than adequately support the two first-degree murder convictions. Lynch thoroughly planned and executed the murder portion of his murder-suicide plot (i.e., the murder of Roseanna Morgan). As we determined on direct appeal: (1) Lynch drafted a murder-suicide letter in which he disclosed his plan to kill Rose-anna Morgan and then commit suicide; (2) Lynch packed a bag with three loaded firearms and brought them with him to the victims’ apartment; (3) Lynch concealed his vehicle to prevent the victims from seeing it; (4) Lynch held Leah Caday hostage for thirty to forty minutes while he waited for her mother; (5) Lynch shot Morgan five times (four times with the Glock G30 and once with another weapon); and (6) Lynch shot Caday while in the process of murdering Morgan. Lynch, 841 So.2d at 366-79. Additionally, the facts established during the penalty phase clearly demonstrated that Lynch had not only exhibited a premeditated intent to murder Morgan, but had also exhibited the “heightened premeditation” necessary to support the CCP statutory aggravator as we held on direct appeal. See id. at 373.
The facts also support Lynch’s conviction for the first-degree murder of Caday. *60 The sentencing court found that Lynch did not intend to kill • Caday; however, the court also recognized that intent is not an issue where one kills another in the course of committing an enumerated felony. See § 782.04(l)(a)(2)(e)-(f), (o), Fla. Stat. (1999) (to kill another while “engaged in the perpetration of, or in the attempt to perpetrate,” “e. Burglary,” “f. Kidnapping,” “o. Murder of another human being,” “is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082” (emphasis supplied)). Thus, the unintentional killing of Caday during the intentional, premeditated killing of Morgan renders the killing of Caday a “murder in the first degree” and a “capital felony.” Lynch’s armed-burglary and kidnapping felonies also render the killing of Caday first-degree felony murder.
Furthermore, the doctrine of transferred intent converts the unintentional killing of Caday into a first-degree capital murder. This Court held in Lee v. State that
one who kills a person through mistaken identity or accident, with a premeditated design to kill another is guilty of murder in the first degree.... The law transfers the felonious intent in such a case to the actual object of his assault, and the homicide so committed is murder in the first degree.
141 So.2d at 259 (emphasis supplied). The indictment alleges that Lynch possessed a premeditated design to murder both Morgan and Caday.[7] The sentencing court found that Lynch only possessed an intent to murder Morgan. Competent, substantial evidence supports the conclusion that Lynch did not intend to kill Caday. These facts are not defenses to first-degree murder because the felony-murder rule and the doctrine of transferred intent apply under these circumstances.
In sum, the factual proffer was adequate to support each first-degree murder conviction. Further, even assuming that counsel were deficient in this regard (which they were not), the facts of this case reveal that any hypothetical prejudice Lynch may have suffered from his counsel’s off-the-cuff factual proffer was de minimis and would not have altered his decision to plead guilty. Counsel and Lynch were well aware of the wealth of evidence supporting the allegations that Lynch committed two first-degree murders on March 5, 1999. Moreover, the trial court was exceptionally thorough in its colloquy with Lynch before it allowed him to enter his guilty pleas, and trial counsel only submitted Lynch’s competing factual proffer to soften the facts for purposes of the penalty phase. Lynch has thus not satisfied his burden under Grosvenor, 874 So.2d at 1179-80.

b. Armed Burglary

Lynch next contends that our decisions in Delgado v. State, 776 So.2d 233 (Fla.2000), and State v. Ruiz, 863 So.2d 1205 (Fla.2003), compel the conclusion that he did not commit a burglary on March 5, 1999, and that he would not have pled guilty had counsel informed him of this case law. He premises this contention on the following portion of his guilt-phase factual proffer:
*61 [H]e gained entry voluntarily into the home at that point in time [ (ie., his initial entry) ]. Subsequently removed from a bag that he had, one of two or three firearms. And at that point in time the kidnapping ensues, as well as what we contend or what the State contends and we admit was, in essence, a burglary, because whatever consent he had to be there was gone.
(Emphasis supplied.) The 1999 version of section 810.02, Florida Statutes, which applies to Lynch’s armed burglary, states:
“Burglary” means entering or remaining in a dwelling ... with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.
(Emphasis supplied.) In Delgado, we held that the rule of lenity (codified in section 775.021(1), Florida Statutes) required that the “remaining in” element of burglary be limited to situations where the defendant surreptitiously remains after having received consent to enter; otherwise, the State could charge that a burglary had occurred in any situation in which an individual entered a dwelling with consent and later committed an offense therein. In Ruiz, we stated:
[T]he essence of Delgado is that evidence of a crime committed inside the dwelling, structure, or conveyance of another cannot, in and of itself, establish the crime of burglary. Stated differently, the State cannot use “the criminal act to prove both intent and revocation” of the consent to enter.
868 So.2d at 1211 (quoting Delgado, 776 So.2d at 288). Delgado applies to burglaries committed before February 1, 2000, which had not been finally adjudicated at the time this Court issued its opinion in that case (i.e., August 24, 2000). See Ruiz, 863 So.2d at 1212. Lynch committed this armed burglary on March, 5, 1999, and his direct appeal was not finalized until January 9, 2003. See Lynch, 841 So.2d at 362.[8] Consequently, Delgado applies to Lynch’s armed-burglary offense.
Lynch is correct that during his guilt-phase proceeding trial counsel misapprehended the then-existing nature of burglary. The facts counsel proffered during the plea colloquy would not support a burglary conviction under Delgado because counsel stated Lynch entered the victims’ apartment with the consent of Leah Caday. The State could not have used the kidnapping of Caday and the murders of Caday and Morgan to prove the burglary elements of (1) lack of consent or revocation of consent and (2) intent to commit an offense within the dwelling. See Ruiz, 863 So.2d at 1211. However, any deficiency in this regard did not prejudice Lynch because trial counsel and Lynch were well aware that he exited the apartment and thereafter sought a non-consensual reentry after having wounded Morgan with three shots from the Glock G30. “Lynch knocked on the door to Morgan’s apartment and said [to Caday], ‘Hurry up, open the door, your mom is hurt.’ ” Lynch, 841 So.2d at 371 (emphasis supplied). Consent to enter induced through fraud or deceit is illusory as a matter of law, and we conclude that the same rationale applies to consent induced through coercion or implied threat of force. Cf, e.g., Andrews v. State, 973 So.2d 1280, 1283 (Fla. 4th DCA 2008) (holding that consent obtained through fraud or .deceit (i.e., false pretense) is a legal nullity). Lynch compelled *62 a minor to open the door of her apartment by shooting her mother and then using her mother’s injuries to gain access to the dwelling with the intent to commit an offense therein (i.e., the murder of Roseanna Morgan). This is not a consensual entry. Lynch and his trial counsel knew that the State possessed facts sufficient to establish burglary. Therefore, the facts of this case reveal that any prejudice Lynch alleges that he may have suffered from his counsel’s off-the-cuff factual proffer would not have altered his decision to plead guilty to the offense of armed burglary.
c. Kidnapping
In the final portion of this guilt-phase ineffectiveness subclaim, Lynch contends that the factual proffer is legally insufficient to support a kidnapping conviction under our decisions in Faison v. State, 426 So.2d 963 (Fla.1983), and Berry v. State, 668 So.2d 967 (Fla.1996). Lynch cannot demonstrate prejudice and, for this reason, we need not address whether the performance of counsel was deficient. See Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (“A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is "not satisfied.”).
In Faison, we recognized that the plain text of section 787.01, Florida Statutes, could lead to potentially absurd results. To limit the scope of this statute, and to prevent any crime that involves some level of confinement or detention from also constituting a kidnapping, we adopted the three-part test articulated by the Supreme Court of Kansas in State v. Buggs, 219 Kan. 203, 547 P.2d 720 (1976):

[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

(a) Must not be slight, inconsequential and merely incidental to the other crime;
(b) Must not be of the kind inherent in the nature of the other crime; and
(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.
Faison, 426 So.2d at 965 (quoting Buggs, 547 P.2d at 731) (emphasis supplied). We also explained that we had previously “adopted the view that subsection 787.01(l)(a)2 did not apply to unlawful confinements or movements that were merely incidental to other felonies, but [had] recognized an exception in the case of hostages.” 426 So.2d at 966 (emphasis supplied) (explaining the holding of Mobley v. State, 409 So.2d 1031, 1036-37 (Fla.1982)). In Berry, we reaffirmed our adherence to the Faison/Buggs test and stated that “the inquiry into whether a kidnapping has occurred does not end with an examination of the statute.... [Tjhere can be no kidnapping where the only confinement involved is the sort that, though not necessary to the underlying felony, is likely to naturally accompany it.” Berry 668 So.2d at 969 (emphasis supplied).
Here, Lynch maintains that his confinement of Caday was wholly incidental to the murders of Caday and Morgan. This assertion is inconsistent with the facts of this case. Lynch approached Caday and lured her into her apartment by stating that he wished to speak with her mother. Once inside, Lynch withdrew a number of firearms from his bag, and he has subsequently admitted that (1) Caday was aware of the firearms, (2) he “technically” held Ca-day hostage, (3) she was “terrified,” and (4) she only complied with his demands based on fear. Under the three-part Fai-son test and the hostage exception from Mobley, Lynch committed a kidnapping on *63 March 5, 1999. First, his movement of Caday was not inconsequential. He wanted access to Caday’s apartment to kill her mother, Roseanna Morgan, and he lured Caday there by stating that he wanted to speak to Morgan. Second, Lynch’s kidnapping and confinement of Caday was not inherent in his intentional murder of Morgan and his erstwhile unintentional killing of Caday. Lynch could have killed Morgan without ever holding Caday hostage, as evidenced by his frequent trips to Morgan’s place of business prior to the events of March 5,1999, and Lynch did not intend to kill Caday. Third and finally, Lynch’s kidnapping of Caday made his murder of Morgan “substantially easier ... [and] substantially lessened] the risk of detection,” because Caday otherwise could have warned her mother or notified neighbors and law enforcement that an armed man was stationed in her apartment waiting for her mother to return home. Faison, 426 So.2d at 965; Berry, 668 So.2d at 969. Trial counsel and Lynch were well aware that the facts of this case supported a kidnapping charge and conviction. Therefore, any prejudice Lynch allegedly suffered from his counsel’s factual proffer was de minimis and would not have altered his decision to plead guilty to the offense of kidnapping.
Trial counsel’s verbal factual proffer in response to the State’s written proffer was not deficient with regard to the first-degree murder charges. With regard to the remaining charges, the proffer did not materially prejudice Lynch because counsel and Lynch knew that the facts of this ease clearly supported convictions for both offenses. Furthermore, as stated above, the trial court was exceptionally thorough in its colloquy with Lynch, and trial counsel only submitted a competing factual proffer to soften the facts for purposes of the penalty phase. Consequently, we deny relief with regard to this guilt-phase ineffectiveness subclaim.
ii. The Confidential Marital-Communications Privilege
In his second guilt-phase ineffectiveness subclaim, Lynch contends that trial counsel were ineffective by failing to advise him with regard to the confidential marital-communications privilege codified in section 90.504, Florida Statutes (2000). Lynch claims that had counsel adequately researched this privilege and informed him of its application, he would not have pled guilty. Specifically, Lynch states that the timely assertion of this privilege would have allowed him to suppress (1) the murder-suicide letter he wrote to his wife, Virginia Lynch, on March 3, 1999, and (2) the phone calls he placed to her on March 5, 1999. Without these central pieces of evidence, Lynch claims that it would have been much easier for counsel to establish the defense theory that these killings were purely accidental and that, as a result, he would have proceeded to trial. We disagree because Lynch cannot demonstrate that he suffered any prejudice as the result of this alleged deficiency.
Lead trial counsel, Mr. Figgatt, testified during the postconviction proceeding that he elected not to file a motion to suppress the murder-suicide letter based on his belief that the letter was a nonprivileged communication. Counsel testified that he consulted a Florida evidence treatise and spoke to an appellate-division public defender concerning the potential suppression of the letter. “[The treatise] basically told me that if the communication was intended to be distributed to third parties, I was sort of stuck.... [Mr. Lynch] directed [his wife] to send this information that he was providing in the letter to the parents of his estranged girlfriend, Miss Morgan.” Figgatt’s co-coun *64 sel, Mr. Caudill, testified that he and Fig-gatt believed that they lacked any valid privilege-based legal argument to suppress the letter, but could not recall whether they reviewed any specific cases.
Based on the content of the letter, counsel may have possessed a nonfrivolous basis to contend that Lynch did not intend to disclose all of the information he related to his wife and did not intend that his wife distribute the letter itself. See, e.g., Bolin v. State, 793 So.2d 894, 896 (Fla.2001) (“If ... the trial court determines from the circumstances in which the letter was sent and from the content of the letter itself that the letter constituted a voluntary consent to such disclosure, then the marital privilege would be waived pursuant to section 90.507- If the court determines, however, that the circumstances together with the content of the letter do not indicate that [the defendant] voluntarily consented to disclosure ..., then there was not a waiver.” (footnote omitted)) (quoting and reaffirming the totality-based test articulated in Bolin v. State, 650 So.2d 19, 21 (Fla.1995)).
In relevant part, Lynch’s March 3, 1999, murder-suicide letter stated:
[Y]ou will find copy of a letter she gave me Jan 11, and a card she gave me Feb 2, a week before it ended. You can see how [unreadable] we were and how ani-malistic she was sexually in card. She loved [Lynch’s son] Steven too, [unreadable] fed him bottle, changed his diaper, gave him banana. Make copies of the letter and card for me and copies of photos, just print them out on printer, don’t have to be full page just 4 X 6 or so. I want you to send copies of letter + card and pictures to her family, Mom + dad in Hawaii, address is [statement of address]. [Repetition of address in ALL-CAPS text] — her SS#was [* * *-* *-* * * *] bom ⅛/1/68. I want them to have a sense of why it happened, some decent closure, a reason and understanding, they are good parents like yours. I want them to know what she did, the pain she caused, that it was not just a random act of violence.
(Emphasis supplied.) Mr. Figgatt conceded during the postconviction proceeding that one reading of the letter could support the interpretation that Lynch only wanted his wife to make copies of the January 11 and February 2 correspondence from Roseanna Morgan, along with copies of the nude photographs he had taken of Morgan, and to send these materials to Morgan’s family in Hawaii. Notwithstanding this very debatable interpretation of the murder-suicide letter, the postconviction court correctly interpreted the letter, and its more persuasive interpretation is supported by competent, substantial evidence:
The Court has carefully read the three exhibits in question and concludes that mere disclosure of Exhibits 24 and 25 [Roseanna Morgan’s correspondence dated January 11, 1999, and February 2, 1999] would not have accomplished Lynch’s stated purpose of providing the victim’s parents and Virginia Lynch’s parents [with] “a sense of why it happened, some decent closure, a reason and understanding.... I want them to know what she did, the pain she caused, that it was not just a random act of violence-” Those two exhibits contain expressions of affection and ... a sense of frustration over the break up of the relationship with Roseanna Morgan, but they do not provide a “reason and understanding” of why “it happened.” Nor do they explain “the pain she caused.” Only the disclosure of the contents of the murder-suicide letter, Exhibit 11, would accomplish that purpose. *65 For that reason, the Court concludes that Lynch intended for the contents of Exhibit 11 to be disclosed....
(Emphasis supplied.) (The postconviction court based its analysis on section 90.507, Florida Statutes.)[9]
The postconviction court’s reasoning focused upon waiver under section 90.507, Florida Statutes (2000), and there is a threshold issue with regard to the murder-suicide letter: Based on the totality of circumstances, did Lynch ever intend that the letter constitute a confidential communication? Section 90.504(1), Florida Statutes (2000), the subsection codifying the confidential marital-communications privilege, states: “A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.” (Emphasis supplied.) Therefore, despite the fact that we broadly construe this privilege to protect spousal confidences,[10] the confidential marital-communications privilege only applies to communications that were originally intended to be confidential. Here, the letter itself represented Lynch’s entreaty to his wife that she disclose all of this information to the victims’ family in Hawai'i. Therefore, Lynch never intended for this message to constitute a confidential marital communication.
With regard to Lynch’s phone calls to his wife during the commission of these offenses, at least one of these conversations occurred in the presence of Leah Caday. We found on direct appeal:
During the course of these events on March 5, 1999, appellant telephoned his wife three times from the apartment. His wife testified that during the first call she could hear a woman screaming in the background [Leah Caday]. Appellant’s wife further testified that the screaming woman sounded “very, very upset.” When Lynch called a second time, he admitted to having just shot someone.
Lynch, 841 So.2d at 366 (emphasis supplied). At a minimum, Caday was alive during Lynch’s first phone call and may have been bleeding to death during Lynch’s second and third phone calls. Therefore, competent, substantial evidence supports the postconviction court’s finding and reasoning that the first conversation was nonprivileged because it occurred in the presence of a third person (Leah Ca-day) and was not intended to be privileged. See § 90.507, Fla. Stat. (2000) (“A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person ... makes the communication when he or she *66 does not have a reasonable expectation of privacy _” (emphasis supplied)); see also Taylor v. State, 855 So.2d 1, 27 n. 30 (Fla.2003) (noting in persuasive dicta that “[a]s a general rule, when third party-eavesdroppers hear otherwise privileged communications, the communications are not privileged unless the communicating parties had a reasonable expectation of privacy ” (emphasis supplied)).
As to the subsequent phone conversations, the postconviction court found that Lynch repeated his statements to Joyce Fagan, the 911 dispatcher; therefore, “Lynch apparently did not intend it to be privileged since he repeated it, but even if it was intended to be privileged, it was cumulative to his later statement and not prejudicial.” In Koon v. State, 463 So.2d 201, 204 (1985), we held that a defendant who confessed to his wife concerning a murder — and repeated this statement to his son and mother-in-law — had not waived the confidential marital-communications privilege. Thus, repetition (in and of itself) does not automatically indicate that the privilege-holder consents to his or her spouse (as opposed to a third party) revealing the contents of the repeated marital communication. Nevertheless, Virginia Lynch stated during a sworn statement on March 16, 1999, that her sister Juliette participated in the third phone call with Richard Lynch. Therefore, the record contains evidence that the third phone call was not a confidential marital communication because it occurred in the presence of a third party who actually participated in the conversation. See § 90.507, Fla. Stat. (2000); Taylor, 855 So.2d at 27 n. 30.
Conversely, assuming that Caday and Morgan were dead during the second phone call, this call may have been a confidential marital communication. Trial counsel thus could have objected to Virginia Lynch’s penalty-phase testimony concerning her second phone conversation with Lynch. Despite this arguable contention, competent, substantial evidence supports the postconviction court’s finding that the subsequent phone calls were cumulative to Lynch’s 911 phone conversation with Joyce Fagan. During the 911 call, Lynch stated: (1) that he had shot two people, that he did not intend to do it, and that they had begun to scream; (2) that he accidentally shot Caday; (3) that the dock accidentally discharged; (4) that he planned to commit suicide; (5) that he shot Morgan with two different firearms and that he “put her out of her misery ”; (6) that he wanted Morgan to repay his $6,000 credit-card debt; (7) that Morgan “drove me to it”-, (8) that he brought three loaded firearms to the victims’ apartment; (9) that Morgan was still breathing when he executed her and that “this is not cold blooded,” “this was not a thing of if I can’t have her no one else will ”; (10) that this was a moment of rage; (11) that he planned to leave his wife; (12) that Morgan had endured some “body hits” before he shot her in the back of the head, and that he had dragged her into the apartment to speak with her; (13) that Caday was “terrified” throughout this ordeal; (14) that he intentionally parked his vehicle in a concealed location to prevent the victims from seeing it and panicking; (15) that he was not a “cold-blooded executioner”; and (16) that “this was just one of these lover things, you know”; and (17) that he wanted to speak with a police negotiator to arrange his surrender. (Emphasis supplied.) Lynch also repeated many of these statements to Stephanie Ryan, the Sanford Police negotiator, and Kristin Ziegler, an investigator with the Sanford Police Department. Therefore, the material substance of Lynch’s phone conversations with his wife would have been placed in evidence through the testi *67 mony of other witnesses, and Lynch has suffered no prejudice in this regard.
We deny relief on this subclaim,
iii. Suppression and the Plain-View Doctrine
Lynch’s third guilt-phase ineffectiveness subclaim is that trial counsel were ineffective for failing to file a motion to suppress the items seized from his home on March 5, 9 and 17, 1999. We deny this claim because Lynch cannot demonstrate that he has suffered any prejudice. Cf. e.g., Maxwell, 490 So.2d at 932 (explaining that the Court need not address Strickland’s deficient-performance prong if the defendant-appellant cannot satisfy the prejudice prong).
As a preliminary matter, Lynch’s warrant-overbreadth ineffectiveness subclaim fails to the extent that he challenges evidence which the police seized but which the State never presented during his trial. See, e.g., Doorbal v. State, 983 So.2d 464, 500 (Fla.2008) (holding that defendant’s claim that counsel was ineffective for failing to seek suppression of certain statements was “without merit because the State ultimately did not introduce the statements into evidence”). Further, the majority of the allegedly objectionable items did not directly relate to Lynch’s guilt (e.g., additional correspondence between Lynch and the victims, photos, credit-card statements and receipts, a computer, media-storage devices (CDs, diskettes, etc.), a grey lockbox, Lynch’s firearms collection, Lynch’s firearms-periodical collection, Lynch’s cameras and photography collection, and Lynch’s pornography collection). On at least three separate occasions, Lynch had previously admitted that he killed the victims: (1) a recorded conversation with a 911 dispatcher, (2) a conversation with a police negotiator, and (3) a videotaped interrogation with police investigators. Therefore, it is improbable that any knowledge of the hypothetical ability to suppress these items would have altered Lynch’s decision to plead guilty.
Second, with regard to trial counsel’s supposed failure to seek suppression of the murder-suicide letter, we need not address whether counsel rendered deficient performance because the letter was plainly admissible under established Fourth Amendment precedent, viz., decisions outlining the plain-view doctrine. As this Court has explained:
[A] warrantless seizure of evidence found in plain view is admissible if at the time of the search: (1) the seizing officer was legitimately in a place where the object could be plainly viewed; (2) the incriminating nature of the seized object was immediately apparent to the police officer; and (3) the seizing officer had a lawful right of access to the object itself. See Horton [v. California], 496 U.S. [128,] at 136-37, 110 S.Ct. 2301 [110 L.Ed.2d 112 (1990)]. With regard to the third requirement, the [High] Court explained that the seizing officer may lawfully seize an incriminating object if the officer has probable cause prior to the seizure and it was discovered within the parameters of a validly executed search warrant or one of the exceptions to the [Fourth Amendment’s general] warrant [requirement]. See id. at 138, 110 S.Ct. 2301; accord Jones v. State, 648 So.2d 669, 676 (Fla. 1994). Indeed, “seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.” Texas v. Brown, 460 U.S. 730, 741-42, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (quoting Payton v. New York, 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).
*68 Rimmer v. State, 825 So.2d 304, 313 (Fla.2002).
In this case, Mrs. Lynch provided sworn deposition testimony disclosing that (1) police officers were present in the Lynch home on a consensual basis[11] shortly following the March 5, 1999, murders of Ro-seanna Morgan and Leah Caday; (2) the police officers were already independently aware of the murder-suicide letter; and (3) Mrs. Lynch was in the process of reading this letter in the officers’ presence. Based upon our independent review, it is abundantly clear from the record that these officers requested Mrs. Lynch relinquish the letter because of its evident connection to these murders. Therefore, we conclude that the police officers — who were then present in the Lynch home on a consensual basis — possessed probable cause to seize the murder-suicide letter, which Mrs. Lynch was reading in plain view. Cf, e.g., Brown, 460 U.S. at 742, 103 S.Ct. 1535 (“[P]robable cause is a flexible, commonsense standard. It merely requires that the facts available to the officer would ‘warrant a man of reasonable caution in the belief,’ that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false. A ‘practical, nontechnical’ probability that incriminating evidence is involved is all that is required.” (citation omitted)(ciimp Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925))). Lynch has thus suffered no prejudice because the murder-suicide letter was plainly admissible under the Fourth Amendment to the United States Constitution and article I, section 12 of the Florida Constitution. The nonexistent ability to suppress this evidence could not have affected Lynch’s decision to plead guilty.
Accordingly, we deny relief on this sub-claim.
iv. Accidental Discharge
In his fourth and final guilt-phase ineffectiveness subclaim, Lynch alleges that trial counsel were ineffective for failing to investigate an accidental-discharge defense and that he would have proceeded to trial had he been aware of this defense. We disagree.
The evidence presented during both the penalty phase and postconviction proceedings is clearly inconsistent with an accidental-discharge defense. Consequently, as a matter of sound strategy, trial counsel elected not to waste finite time and resources preparing such a defense. “[T]rial counsel cannot be deemed ineffective for failing to raise an issue that, as illustrated in the evidentiary hearing testimony, is clearly unsupported by the record.” Power v. State, 886 So.2d 952, 959 (Fla.2004) (emphasis supplied). Competent, substantial evidence supports the postconviction court’s analysis of this issue:
The Glock in question is a large semiautomatic handgun. It is inconceivable that a person could accidentally fire such a weapon seven times for a number of reasons. First, this weapon makes a lot of noise when it is fired. The noise would alert a person who accidentally pulls the trigger once and the person would not continue to pull the trigger a number of times. Second, because this weapon is a semi-automatic pistol, the trigger must be pulled each time the weapon is fired. Third, large caliber semi-automatic pistols deliver a recoil “kick” when fired that tends to throw *69 the barrel upwards and away from the target. It is necessary to re-aim this type of weapon towards the general direction of the target each time the trigger is pulled unless the weapon is being fired in a totally random manner. The evidence in this case does not support random firing. Fourth, there is no mistaking when the firearm is discharging a round. The noise, the recoil, the smoke, and the smell of gunpowder immediately brings to the shooter’s attention the fact that a round has been discharged. Fifth, it stretches the imagination to think that a person could accidentally discharge a semi-automatic weapon seven times and accidentally hit the same person four of the seven times. In such a situation, the person is a target and not the unintended victim of an accidental discharge. Sixth, the Court took the time to inspect the weapon in chambers, and the trigger pull is not even close to being a “hair trigger.” Seventh, it is undisputed that Lynch carried several firearms to Roseanna Morgan’s apartment and fired a 9mm Luger in addition to the Glock.
There was considerable ballistics testimony about the Glock pistol during the penalty phase hearing. Officer Doug Bottalico testified he found several projectiles at the crime scene. One projectile was located in the living room. Another projectile was located in the inside of the front door frame. There was also a bullet hole in the wall of the foyer. Thus, in order to find Mr. Ruel’s [Lynch’s postconviction firearms expert] testimony credible, the Court would have to believe Lynch accidentally discharged the firearm while he was positioned at different locations throughout the apartment and then accidentally shot Leah Caday in the back.
Moreover, Nanette Rudolph, who is employed with the firearms department of the Orlando Regional Crime Lab for the Florida Department of Law Enforcement, testified during the penalty phase. Ms. Rudolph testified that she completed a two-year formal training program in firearms identification. She explained that her training and work experience included examination of projectiles to match them with weapons. Ms. Rudolph testified that she tested the Gloek, and the Glock was operating correctly and that the trigger pull was within normal specifications. She also explained that the Glock was a semi-automatic weapon which requires an individual to release the trigger each time before firing the next shot. She testified that a semiautomatic will fire only once if a person tenses up and pulls the trigger without releasing it. Automatic weapons will continue to fire as long as the trigger is pulled or until the weapon runs out of ammunition. Additionally, during the penalty phase, Dr. Seiber, the medical examiner, testified that the projectile that caused injury to Rosean-na Morgan’s eye, entered her eye and exited from her neck, and not the other way around as Mr. Ruel testified.
[[Image here]]
The Court concludes that calling a ballistics expert to testify about the murder weapon would not have benefited the defendant at trial.
(Record references omitted.) The only “evidence” contained in the record supporting an accidental-discharge claim consisted of (1) Lynch’s self-serving rationalization that he accidentally shot Roseanna Morgan four times, accidentally shot Leah Caday in the back, and then switched weapons to “put [Morgan] out of her misery” by intentionally shooting her in the back of the head; and (2) Roy Ruel’s unsubstantiated assertion during the post-conviction proceeding that one can unin- *70 territorially discharge a properly functioning Glock G30 seven separate times, while striking an unintended target with nearly sixty-percent accuracy (Lynch fired seven shots from the Glock and struck Morgan four times). Trial counsel made a strategic decision not to assert a baseless defense, and “[c]ounsel’s strategic decisions will not be second-guessed on collateral attack.” Johnson v. State, 769 So.2d 990, 1001 (Fla.2000) (citing Remeta v. Dugger, 622 So.2d 452 (Fla.1993)).
The strategic decision of trial counsel not to pursue an accidental-discharge defense did not affect Lynch’s election to plead guilty because the facts of this case are simply inconsistent with accidental discharge. Moreover, this analysis applies with equal force to Lynch’s penalty-phase accidental-discharge claim.
B. Penalty-Phase Ineffectiveness
“To succeed in an ineffective assistance of penalty phase counsel claim, the claimant must demonstrate that counsel performed deficiently and that such deficiency prejudiced his defense.” Hannon v. State, 941 So.2d 1109, 1124 (2006) (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). “Prejudice, in the context of penalty phase errors, is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the outcome of the proceedings.” Gaskin v. State, 737 So.2d 509, 516 n. 14 (Fla.1999), receded from on other grounds by Nelson v. State, 875 So.2d 579, 582-83 (Fla.2004). As previously stated, ineffectiveness claims present mixed questions of law and fact. With regard to factual questions, we defer to the findings of the trial court so long as they are based upon competent, substantial evidence. In contrast, we review de novo related questions of law. See, e.g., Stephens v. State, 748 So.2d 1028, 1031-33 (Fla.1999). We presume that counsel acted effectively and we likewise endeavor to avoid the pitfalls of hindsight bias. Thus, the burden is on the defendant to affirmatively satisfy both prongs of the Strickland framework. See Darling v. State, 966 So.2d 366, 376-77 (Fla.2007); Maxwell, 490 So.2d at 932.
i. The Strategic Decision to Waive a Penalty-Phase Jury
This claim primarily consists of a recrafted version of Lynch’s first guilt-phase ineffectiveness subclaim combined with allegations related to mental-health mitigation, through which Lynch contends that he would not have waived a penalty-phase jury had counsel adequately informed him of the elements of and defenses to the charged offenses along with his diagnosis of “mild cognitive impairment.” However, as previously stated, trial counsel did discuss the elements of and legal defenses to first-degree murder, armed burglary, and kidnapping with Lynch. Competent, substantial evidence supports the conclusion that no valid defenses existed in this case. See analysis in Part II.A.Í, supra. Additionally, as explained in later portions of our analysis, Lynch’s “mild cognitive impairment” has not affected his ability to lead an otherwise normal life, he is of average overall intelligence, and he has never connected this “impairment” to his actions on March 5, 1999, or his decisions with regard to how to best proceed in this case. See analysis in Parts II.B.Ü and II.E.Ü, infra. Therefore, Lynch’s asserted ignorance of hypothetical, unsupported defenses and a comparatively minor mental-health diagnosis could not have affected his decision to waive a penalty-phase jury. Moreover, Mr. Figgatt testified that he discussed potential aggravators with Lynch before Lynch pled guilty and waived a penalty-phase jury. Second- *71 chair trial counsel, Mr. Caudill, corroborated this statement. As explained above, trial counsel’s less than complete guilt-phase factual proffer did not prejudice Lynch because both he and trial counsel were well aware of the fact that the State possessed the necessary evidence to prove his guilt for each charged offense. See analysis in Part II.A.Í, supra.
Counsel were justifiably concerned that this case involved a thoroughly planned and executed murder of a former lover and the accompanying murder of her minor daughter. Trial counsel’s recommendation was a strategic decision to conduct the penalty phase with the court sitting as the factfinder. In the words of trial counsel, they were “presenting this to a judge who wasn’t going to be emotional about the fact that there was a death of a child, and the jury was going to be.” (Emphasis supplied.) Lynch has not demonstrated prejudice, and it is unclear how further discussion of hypothetical defenses, which did not exist in this case, and a comparatively minor mental-health -diagnosis would have altered his decision to forgo a penalty-phase jury in favor of a potentially less emotional, highly experienced jurist.
Accordingly, we deny relief on this sub-claim.
ii. Mitigation
Lynch also presents a penalty-phase subclaim that counsel failed to conduct a reasonably competent mitigation investigation and present evidence of cognitive impairment. We deny relief on this subclaim because Lynch cannot demonstrate that he has suffered any prejudice.
With one major exception (Lynch’s mild cognitive impairment) and several minor exceptions, the mitigation evidence and testimony that he presented during the posteonviction proceedings “may generally be described as only a more detailed presentation of the mitigation that was actually presented during the penalty phase.” Darling v. State, 966 So.2d 366, 377 (Fla.2007). During the postconviction proceedings, Lynch presented the lay testimony of Eugene Cody (his barber in Sanford, Florida), Edward Corso (Lynch’s cousin by marriage), Danelle Pepe (Lynch’s cousin), Vesna Lovsin (a former coworker who did not remember Lynch, but whom Lynch claimed was a former lover), Joseph Joyce (Lynch’s landlord when he resided in New York), and George Kabbaz, Jr. (an acquaintance from New York whose father also knew Lynch). The testimony with regard to Lynch’s personal history and background merely corroborated or slightly expanded upon penalty-phase testimony, and this Court has held that “even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.” Darling, 966 So.2d at 377 (citing Gudinas v. State, 816 So.2d 1095, 1106 (Fla.2002); Sweet v. State, 810 So.2d 854, 863-64 (Fla.2002)). For the most part, the postconviction lay witnesses simply provided slightly more detail concerning the fact that Lynch was (1) a geeky, weird kid, a “Little Lord Fauntleroy,”[12] which referred to Lynch’s perpetually fastidious mode of dress; (2) Lynch did not have many friends; (3) Lynch did not have any girlfriends until he met his wife, Virginia Lynch; (4) Lynch was a “peculiar,” “weird,” “quirky,” “strange” adult; (5) Lynch’s father was a strict disciplinarian; (5) Lynch was extremely close to his mother and spent much of his time with her; and (6) Lynch lived with his mother until his thirties and *72 slept in a bedroom with his parents — and later his widowed mother — into early adulthood (Lynch had his own bed, and for most of this time, he and his parents resided in a one-bedroom apartment in Brooklyn, New York).
During the penalty-phase proceedings, Dr. Jacquelyn Olander — a forensic neurop-sychologist and Lynch’s mental-health expert — provided comparable testimony that (1) Lynch’s father was a security guard who was laid off due to a disability and became a stay-at-home father, (2) Lynch’s father was a very strict disciplinarian and required Lynch to report to him every thirty minutes, (3) if Lynch was outside playing, his father required him to check in at excessively frequent intervals, (4) if Lynch’s father was not home, he required Lynch to sign a sheet evidencing his check-ins, (5) neighborhood children teased Lynch concerning his check-ins with his father, (6) Lynch’s father inflicted significant abuse, (7) Lynch’s aunt, cousins, and next-door neighbor reported a lack of positive interaction between Lynch and his father, (8) the family described Lynch as a caring individual but “weird,” “strange,” and “rigid” (9) Lynch’s cousin, Danelle Pepe, described one instance in which Lynch was reading a magazine upside-down, (10) Lynch washed his hands and automobile excessively, (11) Lynch had a very close relationship with his mother, (12) when Lynch’s mother attempted to “run interference between” Lynch and his father, the father would physically abuse the mother in Lynch’s presence, and (13) Lynch lived with his mother into his thirties, and even for a short time after his marriage to Virginia Lynch. Dr. Olan-der’s psychological report and penalty-phase testimony demonstrated a thorough understanding of Lynch’s history and idiosyncrasies.
Mr. Caudill testified that he and Mr. Figgatt made a strategic decision to present all mitigation through a mental-health expert because an expert possesses the ability to synthesize all of this information and to present it as one coherent whole, in a manner that is specifically tied to the events that led to the charged offenses. In contrast, trial counsel explained that presenting mitigation through lay witnesses has the potential to create a disconnect between a defendant’s background or history and the events at issue (i.e., the charged offense(s)). Mr. Figgatt also testified that presenting mitigation evidence through Dr. Olander was beneficial to Lynch because the court “likes to get to the point.” As we have previously held, “[cjounsel’s strategic decisions will not be second-guessed on collateral attack.” Johnson, 769 So.2d at 1001 (citing Remeta, 622 So.2d 452). Further, even assuming that counsel performed deficiently by not personally contacting some of the witnesses suggested by Lynch, he was not prejudiced because Dr. Olander contacted and spoke with Lynch’s immediate family before testifying during the penalty-phase proceedings, and Lynch’s postconviction lay witnesses merely corroborated much of Dr. Olander’s prior testimony.
The remainder of the lay-witness testimony was irrelevant, cumulative, disputed, or contradicted. For example, (1) Danelle Pepe testified that Lynch and his mother bit their nails and that when Lynch’s mother passed away, and hospital staff removed an IV from her hand, Lynch took a tissue, dabbed the blood from his mother’s hand, and held the blood-soaked tissue next to his face like a “snuggly” (irrelevant and remote in time to the events of March 5, 1999); (2) Gene Cody testified that Lynch dyed his hair and was “very sick” when he visited Cody’s barbershop during early March 1999 (Lynch offered this testimony as evidence of “decompensation” *73 (i.e., stress-induced psychological deterioration); however, Dr. Olander testified during the penalty phase that Lynch was decompensating at the time of these offenses (cumulative)); (3) Edward Corso testified that Lynch’s father was a racial bigot and that Lynch grew up in a safe Brooklyn neighborhood (irrelevant; cumulative); (4) Vesna Lovsin testified that although she worked at the same New York bank where Lynch was previously employed, she did not know or remember Lynch, and that she never had sex with or lived with Lynch (Lynch offered this testimony to support his claim that he suffers from delusions; however, Lynch never mentioned Lovsin to anyone, including the mental-health experts involved in this case, until 2005 (i.e., after this Court affirmed his convictions and sentences on direct appeal), and Dr. Olander testified during the penalty phase that Lynch suffers from delusional thinking (disputed; irrelevant; cumulative)).
With regard to the non-mental-health documentary evidence that Lynch submitted during the postconviction proceedings, much of it was irrelevant or merely corroborated the personal, biological, and employment histories that Lynch self-reported during the penalty-phase proceedings. For example, (1) the trial court was already aware of Lynch’s credit-card debt at the time of the offenses and how that debt related to the offenses (Lynch wanted to force Roseanna Morgan to repay the' debt); therefore, the documentary evidence concerning credit-card receipts and statements was unnecessary; (2) Lynch’s citizen’s-arrest commendations were remote in time to the offenses involved in this case (early 1980s versus 1999); (3). the trial court was already aware of Lynch’s employment history; therefore, his employment records were cumulative; and (4) the trial court was aware that Lynch was formerly a devout Catholic; therefore, his Catholic Church confirmation photograph was at least partially cumulative.
The mental-health mitigation Lynch presented during the postconviction hearing is the only truly new mitigation evidence that he has provided. However, the mental-health experts agree that Lynch’s frontal-lobe and right-hemispheric developmental cognitive impairment is “mild” and that his condition is constant and static (i.e., he has likely suffered from this impairment throughout his life and he is not becoming progressively worse). Moreover, Lynch has not connected any cognitive impairment to the events of March 5, 1999, which, in contrast, reveal a carefully crafted murder plot.
Lynch and the State disagree concerning whether this case is more similar to Orme v. State, 896 So.2d 725 (Fla.2005), or Darling v. State, 966 So.2d 366 (Fla.2007). In Orme, we stated that “counsel has a duty to make reasonable investigations or to make.a reasonable decision that makes particular ( investigations unnecessary,” that “the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated,” and that “the failure of counsel to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so.” 896 So.2d at 731 (brackets omitted) .(quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052; State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002); Asay v. State, 769 So.2d 974, 985 (Fla.2000)). However, in Darling the Court stated:
[D]efense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire. Even if the evaluation by [a retained mental-health expert], which found no indication of brain damage to warrant a *74 neuropsychological workup, was somehow incomplete or deficient in the opinion of others, trial counsel would not be rendered ineffective for relying on [the expert’s] qualified ... evaluation.
Darling, 966 So.2d at 377 (citation omitted) (citing State v. Sireci, 502 So.2d 1221, 1223 (Fla.1987)).
In the instant case, Lynch’s trial counsel originally retained Dr. David Cox, a neu-ropsychologist. Dr. Cox concluded that Lynch suffered from cognitive disorder NOS (not otherwise specified) and a possible paranoid personality disorder. Dr. Cox recommended further neuropsycho-logical testing to determine the degree of Lynch’s impairment. Trial counsel were not pleased with the style of this expert’s report, which they felt (1) was “amateurish” and (2) did not properly connect the diagnosis to the events of March 5, 1999. Trial counsel later dismissed Dr. Cox in favor of another neuropsychologist, Dr. Jacquelyn Olander. Trial counsel did not inform Dr. Olander that Dr. Cox had previously diagnosed some level of cognitive impairment. However, trial counsel did inform Dr. Olander that they had previously retained Dr. Cox. Dr. Olander respected Dr. Cox, and she assumed that if Lynch suffered from a cognitive impairment, it would have already been discovered and reported by the previous expert. Dr. Olander also assumed that trial counsel would have informed her if Lynch had received an impairment diagnosis. Based on these assumptions, Dr. Olander did not conduct neuropsychological testing with Lynch, but rather conducted only psychological testing. Dr. Olander diagnosed Lynch with schizoaffective disorder, which is a combination of schizophrenic symptoms and a mood disorder. She specifically testified at trial that Lynch did not have any brain impairment. Consequently, in sentencing Lynch, the trial court was unaware of the fact that Lynch suffered from some level of cognitive impairment.
During the postconviction hearing, Mr. Figgatt and Mr. Caudill conceded that they were aware that Dr. Cox had diagnosed Lynch with a cognitive impairment. Further, they admitted that they did not follow up on this diagnosis, did not inform Dr. Olander, and did not obtain Lynch’s school records or other background information to corroborate that Lynch suffered from some level of cognitive impairment. Lynch’s school records might have been helpful in this regard because they reflect a disparity between his verbal and mathe-matic abilities (verbal exercises are predominately left-brain tasks, whereas math exercises are predominately right-brain tasks). Thus, Lynch’s relatively good grades in English and religion, as compared to his low grades in mathematics courses and mechanical drawing, could have assisted his mental-health experts in diagnosing and attempting to corroborate a developmental cognitive impairment. Relatedly, Lynch’s standardized test scores also reflect a disparity.
Orme is somewhat similar to this case in that Orme’s trial counsel was aware that he had previously been diagnosed with bipolar disorder. 896 So.2d at 733. Despite this knowledge, trial counsel did not present any penalty-phase evidence concerning Orme’s bipolar diagnosis. See id. at 733-35. Counsel also “did not conduct followup interviews with Orme’s family and friends to determine if Orme had exhibited behavior in accord with a bipolar diagnosis.” Id. at 733. Finally, counsel “did not inform his trial experts that Orme had been diagnosed with bipolar disorder and ... did not provide the experts with the prison medical records that would have shown the medications prescribed to Orme indicating such a diagnosis.” Id. “Orme’s experts never knew that such a diagnosis *75 had been made.” Id. In Orme, we reversed the defendant’s death sentence and remanded for a new penalty-phase proceeding. Id. at 736.
The facts of this case are similar to Orme in some respects. With regard to mental-health mitigation, this case is not similar to Darling because, here, counsel were aware that a nontestifying neuropsy-chologist had diagnosed Lynch with a cognitive impairment, and they did not transmit this information to their testifying mental-health expert; whereas, in Darling, counsel chose between the competing opinions of two properly informed mental-health experts. See 966 So.2d at 377. Based on the fact that trial counsel knew Lynch suffered from some type of cognitive impairment and never fully investigated this condition, counsel were deficient during the penalty phase in failing to address and utilize evidence related to Lynch’s frontal-lobe and right-hemispheric cognitive impairment.
However, this determination does not end our ineffectiveness inquiry because counsel’s error must have prejudiced Lynch. See, e.g., Orme, 896 So.2d at 735 (citing Stewart v. State, 801 So.2d 59, 65 (Fla.2001)). During the postcon-viction hearing, seven mental-health experts testified and agreed that Lynch suffers from a “mild” cognitive impairment. This included both the State and Lynch’s experts (Lynch: Dr. David Cox (neuropsychologist), Dr. Jacquelyn Olan-der (neuropsychologist), Dr. David McCraney (neurologist), Dr. Joseph Ses-ta (neuropsychologist), and Dr. Joseph Chong-Sang Wu (psychiatrist); State: Dr. William Riebsame (psychologist), and Dr. Jeffrey A. Danziger (psychiatrist)). However, the experts differed as to whether Lynch’s frontal-lobe and right-hemispheric impairment, in combination with his alleged mental illness (schizoaffective disorder), qualified him for the mental-health mitigators codified in section 921.141(6)(b), (f), Florida Statutes (2001) (“(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.... (f) The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.” (emphasis supplied)). Drs. Cox, dander, McCraney, and Sesta (Dr. Wu was not offered for this purpose) believed that Lynch qualified for the statutory mitigators, and Dr. Sesta stated that Lynch’s frontal-lobe impairment is such that some neuropsychologists might have opined that Lynch was legally insane at the time of the crime, although he would not do so. Dr. Wu testified that Lynch’s PET-sean results were consistent with frontal-lobe and right-hemispheric impairment because these areas of Lynch’s brain exhibited reduced metabolic activity.
Conversely, Drs. Riebsame and Danziger expressed the opinion that Lynch does not qualify for the statutory mental-health mitigators. Of these two State experts, Dr. Danziger’s opinion is of much greater value because Dr. Riebsame eventually conceded that some of his psychological testing of Lynch was invalid due to the nonstandardized fashion in which the tests were administered. Dr. Danziger’s explanation of Lynch’s mindset on the date of the murders is the most persuasive of those offered during the postconviction proceedings:
[Lynch] is someone who did not act in an impulsive fashion.... What we have here is two days before [the offenses,] the letter shows a murder/suicide plot. Earlier that day, according to his wife, he acted perfectly normal, he took care *76 of his children, he dropped his son off. Nothing in his behavior suggested disorganization, psychotic thinking, agitation, a perfectly unremarkable morning in the life of Mr. Lynch taking care of his children and waiting for his wife to come home.... He then takes three guns in a bag, all of them loaded, drives over to the apartment complex, puts his car somewhere [Roseanna Morgan] can’t see it as she’s coming in[to] her apartment. What does this suggest? Planning, forethought, organization, not impulsive action, not a, I caught you in bed with somebody so I strangled you in the heat of the moment or without thinking. This is something planned and organized. He then waits, sees [Leah Ca-day], essentially follows her up the stairs and somehow either forces or cajoles his way in, holds her hostage, waiting however long, thirty, forty minutes, all of which at any time he could have changed his mind. This was not something that happened instantly but went on over this extended period of time. Of course then Roseanna appears at the door, shots are fired, he drags her in, administers the coup de grace, and then Leah gets hit. He then changes his mind on the suicide plan and then decides that he wishes to live. As I put all of this together, we have a man with no significant prior psychiatric history, no evidence of psychosis, no evidence of dementia, functioning perfectly unremarkably in his life.
Thus, Lynch displayed organized, methodical planning in his perpetration of these offenses. Further, he displayed critical impulse control in electing not to inflict self-harm. During and after the offenses, Lynch explained his actions in a detailed, specific fashion. In this regard, this case is totally distinguishable from Orme. Orme had an extensive history of abusing alcohol and illegal drugs (cocaine and barbiturates), and he was under the influence of these substances at the time he strangled his victim. See 896 So.2d at 729-30. Further, these drugs interacted with his bipolar disorder. Id. at 733-36. In Orme, we concluded that
[ajdditional testimony in support of the intoxication and its causes and effects may have warranted greater weight, and the resulting weighing of mitigation and aggravation would have been different. Thus, the fact that the jury did not hear the evidence of Orme’s bipolar disorder combined with the jury’s penalty phase vote of seven to five undermines our confidence in the result of the penalty phase. Therefore, we remand this case for a new penalty phase proceeding.
896 So.2d at 736 (emphasis supplied). The Orme decision hinged on the facts related to the defendant’s bipolar disorder, which supported his claim that he was less culpable for the murder. The interaction of a bipolar disorder with the defendant’s intoxication — at the moment he killed the victim — was the dominant and significant factor leading to our decision in Orme. In contrast, here, Lynch was completely sober when he killed the victims, and a mass of evidence demonstrates that he methodically planned the murder-suicide plot.
Finally, with regard to a related demonic-presence argument, which Lynch raised as a basis for demonstrating emotional disturbance and hallucination, Dr. Danziger testified that Lynch stated:
[H]e felt the presence of something evil or devilish. When [Dr. Danziger] asked him about it he said he really did not see anything, didn’t hear anything, just had a feeling as if the hairs on the back of his neck were standing up.... That’s not an unusual reaction with two deceased people in the room that you’ve just shot.... [B]ased upon what he told me, as well as all of the data I *77 reviewed, I did not see anything suggestive of a psychotic process or any sort of psychotic diagnosis.
(Emphasis supplied.) Lynch’s reaction to the murders is thus wholly consistent with a realization that he had committed terrible acts.
Lynch has simply failed to present any evidence connecting any cognitive condition to his behavior. Even if we fully accepted the testimony of his postconviction mental-health experts, there has been little to no testimony establishing that any impairment or schizoaffective symptoms contributed to his actions on March 5, 1999. Lynch had no prior history of criminal activity but by all defense accounts has always had this condition. Furthermore, he thoroughly planned and carried out his memorialized intent to murder Roseanna Morgan and then demonstrated critical impulse control by refusing to commit suicide. Cf, e.g., Hoskins v. State, 965 So.2d 1, 17-18 (Fla.2007) (affirming death sentence and stating, “the facts show an element of planning [and] are inconsistent with a claim that [the defendant] was under the influence of an extreme mental or emotional disturbance.... [Further,] there was no evidence that because of the frontal lobe impairment [the defendant] could not appreciate the criminality of his conduct at the time of the murder.”); Robinson v. State, 761 So.2d 269, 277-79 (Fla.1999) (affirming death sentence despite evidence of mild brain damage where no evidence existed that the defendant committed the murder as a result of his condition).
Consequently, we deny relief with regard to this subclaim because Lynch has not demonstrated that the mitigation investigation and penalty-phase presentation of trial counsel prejudiced him. These factors do not satisfy the legal requirements necessary to produce the requested relief. The death sentences imposed by the trial court remain legally sound even after careful consideration of the mitigation evidence presented during both the penalty-phase and postconviction proceedings.
iii. The Confidential Marital-Communications Privilege
This claim also fails when couched in terms of penalty-phase ineffectiveness because Lynch cannot establish the prejudice required by law. We have concluded that the postconviction court’s reading of the murder-suicide letter is supported by competent, substantial evidence and is more persuasive than that of postconviction counsel. See analysis in Part II.A.Ü, supra. Lynch has not, and cannot, establish prejudice because a proper interpretation of the murder-suicide letter reveals that Lynch never intended for the transmitted communication to be confidential. To establish prejudice, the defendant must demonstrate that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (emphasis supplied). Even assuming that counsel had sought to suppress the murder-suicide letter, there is no reasonable probability that the result would have differed because, under an appropriate reading, the letter is nonprivileged and admissible.
With regard to Lynch’s phone calls to his wife during his commission of the charged offenses, the first phone call was not privileged because Caday was present during the conversation, the third phone call was similarly not privileged because Lynch’s sister-in-law was present during, and participated in, the conversation, and the second and third phone calls were *78 cumulative to other evidence and testimony. See analysis in Part II.A.Ü, supra. Therefore, Lynch was not prejudiced in this regard, and we deny relief for this subclaim.
iv. Accidental Discharge
Our analysis in Part II.A.iv, supra, explains that the facts of this case are wholly inconsistent with accidental discharge and, therefore, we deny relief on this claim.
C. Alleged Judicial Bias
A motion to disqualify is governed substantively by section 38.10, Florida Statutes, and procedurally by Florida Rule of Judicial Administration 2.330. See Cave v. State, 660 So.2d 705, 707 (Fla.1995); In re Amendments to Fla. Rules of Jud. Admin., 939 So.2d 966, 1003 (Fla.2006). The rule provides that a motion to disqualify shall show that “the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge”; or that the judge is either an interested party to the matter, related to an interested party, related to counsel, or “is a material witness for or against one of the parties to the cause.” Fla. R. Jud. Admin. 2.330(d). In Arbelaez v. State, 898 So.2d 25 (Fla.2005), we addressed the standard of review applicable to a denial of a motion to disqualify:
Whether a motion to disqualify the judge is legally sufficient is a question of law we review de novo. See, e.g., Chamberlain v. State, 881 So.2d 1087 (Fla.2004); Barnhill v. State, 834 So.2d 836, 842 (Fla.2002). Such a motion will be deemed legally insufficient if it fails to establish a “well-grounded fear on the part of the movant that he will not receive a fair hearing.” Arbelaez [v. State], 775 So.2d [909] at 916 [(Fla.2000)] (citing Correll v. State, 698 So.2d 522, 524 (Fla.1997)). A mere “subjective fear[ ]” of bias will not be legally sufficient; rather, the fear must be objectively reasonable. Fischer v. Knuck, 497 So.2d 240, 242 (Fla.1986). The primary consideration is whether the facts alleged, if true, would place a reasonably prudent person in fear of not receiving a fair and impartial trial. Id.
Arbelaez, 898 So.2d at 41. A petition for writ of prohibition is the proper means through which to challenge a lower court’s denial of a motion to disqualify. See Bundy v. Rudd, 366 So.2d 440, 442 (Fla.1978); see also Carrow v. Fla. Bar, 848 So.2d 1283, 1285 (Fla. 2d DCA 2003).
Lynch contends that the conduct of the postconviction court after the conclusion of the rule 3.851 hearing and the court’s analysis and commentary in its second amended order denying postconviction relief and rehearing rendered the court a material expert witness for the State and demonstrated palpable judicial bias. Specifically, Lynch maintains that the postcon-viction court “test-fired the [Glock G30] in chambers, presumably without bullets, ... to determine the trigger pull of the gun. This testing was done ex parte,[13] without notice to counsel.” Lynch further asserts that there is no way of ascertaining (1) the conditions under which the postconviction court conducted this testing, (2) whether the postconviction court possessed the proper “background, expertise and knowledge” to test the gun, or (3) whether the Glock G30 had been altered in any fashion since Lynch’s firearms expert last examined the weapon. Therefore, Lynch claims that the court improperly denied his motion to disqualify, and he requests that we *79 remand for a new postconviction hearing before a different judge.
We deny relief as to this judicial-bias claim because the judge, sitting as the factfinder, merely examined an item in evidence (i.e., the Gloek G30) and drew nonscientific conclusions from his manual manipulation of the weapon, which were consistent with the testimony of the firearms experts. Cf. Fla. R.Crim. P. 3.400(a)(3) (“The court may permit the jury, upon retiring for deliberation, to take to the jury room ... all things received in evidence other than depositions.”)• As the Fourth District Court of Appeal recently observed:
Several jurisdictions that have addressed the issue of permissible juror experimentation have generally concluded that recreation or testing of testimony adduced at trial on objective evidence items is acceptable. “Jurors, during deliberations, may engage in experiments which amount to no more than a careful evaluation of the evidence presented at trial.”
Castillo v. Visual Health & Surgical Ctr., Inc., 972 So.2d 254, 255-56 (Fla. 4th DCA 2008) (citations omitted) (quoting 89 C.J.S. Trial § 798 (2007)) (citing Carol J. Miller, Annotation, Propriety of Juror’s Tests or Experiments in Jury Room, 31 A.L.R.4th 566 (1984)), review denied, No. SC08-425, 2008 WL 3545601 (Fla. Aug. 14, 2008). Here, the judge was the factfinder during both the trial and postconviction proceedings and merely conducted “a careful evaluation of the evidence presented” without supplying additional facts or evidence of which the parties were unaware. Further, the judge only did so after taking judicial notice of all the evidence and testimony admitted during Lynch’s trial.
We originally considered this bias claim after the postconviction court denied the disqualification motion as legally insufficient. As a result of that denial, Lynch filed an emergency petition for writ of prohibition with this Court. On July 11, 2006, we denied this petition without prejudice to enable Lynch to raise this claim during his postconviction appeal. On October 9, 2006, the postconviction court issued a second amended order denying Lynch’s rule 3.851 motion and denying rehearing, in which it addressed Lynch’s judicial-bias claim. The court interpreted our denial of Lynch’s petition for writ of prohibition as a signal that it was free to address the merits of this bias claim.
We would have preferred that the post-conviction court refrain from personally refuting claims of bias that it had previously rejected as legally insufficient in a prior order. Nevertheless, in the first instance, the court properly denied the disqualification motion as legally insufficient without commenting on the facts or the veracity of the defendant. Cf. MacKenzie v. Super Kids Bargain Store, Inc., 565 So.2d 1332, 1339 (Fla.1990); Bundy, 366 So.2d at 442. Furthermore, in its second amended order denying relief and rehearing, the postcon-viction court properly concluded that it had not “tested” the gun and that it had not acted as a material witness; rather, the court, as the factfinder, simply examined a piece of evidence in chambers and corroborated the claims of the relevant experts that the trigger pull of this particular Glock G30 fell within the normal range.
In reaching this holding, we do not rely upon or endorse the extrajurisdictional precedent relied upon by Lynch, the State, or the postconviction court. We merely hold that the postconviction court’s in-camera manual manipulation of the Glock’s trigger to corroborate the claims of the firearms experts that (1) the gun was properly functioning, and (2) that the trigger pull was within the normal range, was *80 not improper and did not display judicial bias. The judge did not engage in any independent scientific or ballistics testing. Rather, he simply held the weapon — which had been admitted into evidence — and pulled the trigger. None of his conclusions required any specialized training or knowledge beyond that which had been imparted by the testifying firearms experts; further, all of his conclusions were drawn from and supported by the testimony of these experts.
In this respect, it is important to outline the testimony of the relevant firearms experts. During the penalty-phase proceedings, the State’s firearms expert, Nanette Rudolph, concluded: (1) that the Glock G30 was operating correctly; (2) that the trigger pull was within normal specifications; and (3) that the Glock is a semiautomatic weapon which requires the shooter to release the trigger each time before firing the next shot. Similarly, during the postconviction hearing, Lynch’s firearms expert, Roy Ruel, testified that he examined the Glock G30 at the Sanford Police Department and concluded: (1) that the trigger safety, the firing-pin safety, and the drop safety were all in proper working order; (2) that the weapon was in good overall condition and was properly functioning; (3) that “[t]he interference was completely in accord with Glock specifications, meaning that the gun would only fire with the pull of the trigger”; (4) that the trigger pull on the Glock was 5 to 5.5 pounds as tested by the State’s firearms expert; (5) that the Glock did not have a modified trigger or connector; and (6) that after that first shot, the Glock would have recoiled and produced “one hellish [muzzle] flash and loud noise.” The findings of the postconviction court mirror this testimony, and the court merely rejected as incredible Ruel’s unsubstantiated assertion that one can unintentionally discharge a properly functioning Glock G30 seven separate times, while striking an allegedly unintended target with nearly sixty-percent accuracy.
In sum, we conclude that recusal or disqualification was unwarranted in this case because the judge, sitting as the fact-finder, did not exhibit any bias when he examined a murder weapon that was indisputably in evidence. The postconviction court thus properly denied Lynch’s motion to disqualify as legally insufficient. However, in the future, we caution that judges should not interpret our denial of an emergency petition for writ of prohibition here as a license to address the merits of the underlying recusal or disqualification motion.
D. Expert Witnesses and the Prevailing Norms of Capital Defense Counsel
Lynch contends that the postcon-viction court erred in excluding the testimony of attorney Robert Norgard concerning the standards of practice and prevailing norms of Florida capital defense counsel during 1999-2001 (i.e., the timeframe during which trial counsel represented Lynch). The decision of a post-conviction court to exclude the testimony of an expert is reviewed for abuse of discretion. See Frances v. State, 970 So.2d 806, 813 (Fla.2007). This standard is satisfied when “the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court.” Huff v. State, 569 So.2d 1247, 1249 (Fla.1990) (quoting Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980)).
Lynch asserts that the refusal of the court to permit this testimony constituted an abuse of discretion because this judicial action infringed upon his right to due pro *81 cess. However, a review of the portion of the record that addresses the testimony of attorney Norgard does not reveal a due-process objection. Further, in his reply brief, Lynch does not direct our attention to any location in the record where such an objection may be found. Accordingly, Lynch did not present a germane, specific due-process claim below. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) (“[F]or an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.”).
Nonetheless, even if Lynch had properly presented a due-process objection below, he would not be entitled to relief. In Strickland, the United States Supreme Court explained the role of prevailing professional norms in determining whether the conduct of counsel in a specific case fell below the objective standard of reasonableness:
In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel’s assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) (“The Defense Function”), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel’s conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.
466 U.S. at 688-89, 104 S.Ct. 2052 (emphasis supplied). Lynch contends that the emphasized language “and the like,” encompasses and envisions expert testimony as a source of evidence with regard to the professional norms in existence for capital counsel at the time of a defendant’s trial. According to Lynch, because expert testimony is an available medium through which to introduce evidence of prevailing professional norms, the refusal of a post-conviction court to receive such evidence constitutes an abuse of discretion.
Lynch’s reasoning is unpersuasive. Lynch provides no decision which has held that a postconviction court abuses its discretion when it precludes expert testimony with regard to the prevailing norms of capital representation. The High Court’s explicit reference in Strickland to the ABA guidelines demonstrates that expert testimony is not the only source of evidence to establish standards of capital representation. Indeed, during the evidentiary hearing, Norgard stated that “there are a number of ways that Capital Collateral Counsel can present to the Court information about what is expected of a criminal defense attorney.” Further, the Strickland Court noted that the ABA standards “and the like” are “only guides,” which indicates that such evidence is not something that must be received into evidence for a post-conviction court to properly evaluate trial counsel’s effectiveness during a capital case. 466 U.S. at 688, 104 S.Ct. 2052 (emphasis supplied).
Finally, even if the refusal to admit expert testimony concerning the norms of capital representation constitutes an abuse of discretion under certain discrete circumstances, it does not here. Under section 90.702, Florida Statutes, expert testimony is admissible only where “specialized knowledge will assist the trier of fact in understanding the evidence or in deter *82 mining a fact in issue.” Hypothetically, a situation could exist in which a judge presiding over a postconviction case could receive the testimony of an expert to assist the court in determining whether trial counsel rendered ineffective assistance.[14]
Conversely, here, the presiding postcon-viction judge has been adjudicating capital cases in Florida for many years. He is extremely seasoned in this field, and even the testifying expert conceded this point. During his testimony, attorney Norgard was of the opinion that a judge who has recently left the bench would not meet the minimum qualifications to serve as lead capital counsel. When the postconviction judge asked Norgard, “You don’t think I could get away with it?,” Norgard responded, “You probably could. I’d agree with that” (Emphasis supplied.) Thus, expert testimony was not an essential element to assist the postconviction court in addressing this issue.
Expert testimony is not the sole means through which the norms of capital representation are to be established, and this particular postconviction judge is sufficiently familiar with these standards. Therefore, the judge did not abuse his discretion by excluding attorney Norgard’s testimony here concerning the standards of capital representation at the time of Lynch’s trial. Accordingly, we deny relief on this claim.
E. Brady and Giglio Claims
Lynch next contends that the State withheld potentially exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the State knowingly presented false testimony in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, Lynch cannot satisfy the requisite elements of these claims, and we accordingly deny relief.
i. Brady
To establish a Brady violation, a defendant must demonstrate that (1) favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and that (3) because the evidence was material, the defendant was prejudiced. See Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000). To satisfy the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed, the factfinder would have reached a different verdict or judgment. See Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome. See Way, 760 So.2d at 913; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936. In this context, we defer to the trial court on questions of fact, but review de novo associated questions of law. See Mordenti v. State, 894 So.2d 161, 169 (Fla.2004); Way, 760 So.2d at 913.
Here, Lynch claims that during the penalty-phase proceedings the State possessed (1) Lynch’s school records, which suggested brain damage; (2) two citizen’s-arrest commendations for thwarting a robbery and assault; (3) notes from Lynch’s mother regarding his low birth weight; (4) letters from Lynch’s mother to Lynch evidencing the excessive closeness of their relationship; (5) a childhood photo of Lynch during his Catholic confirmation holding a rosary and a bible; (6) a death certificate corroborating Lynch’s claim *83 that Roseanna Morgan ended their relationship on the anniversary of the death of Lynch’s mother; (7) marriage certificates evidencing Lynch’s justice-of-the-peaee marriage to his wife and the considerable age difference between Lynch’s parents. Lynch further claims that the State’s decision to withhold this evidence prejudiced his ability to present relevant, potentially dispositive mitigation evidence. Lynch attributes particular significance to his school records because his postconviction mental-health experts testified that these records were mitigating in that they further demonstrated his frontal-lobe and right-hemispheric impairment. Lynch contends that these school records revealed a marked disparity between his verbal abilities and his math abilities. In the opinion of his mental-health experts, the degree of this disparity is evidence of cognitive impairment.
Despite his extensive listing of the mitigation evidence that the State allegedly withheld, Lynch neglects to mention that he stored much of the allegedly withheld mitigation in a grey lockbox that the Sanford Police Department seized from his home pursuant to a search warrant. During the postconviction hearing, collateral counsel extracted items from this lockbox to question trial counsel. This lockbox was listed on the evidence receipt that the State provided to Lynch during pretrial discovery. The search-warrant inventory lists “gray lock box recovered from side of night stand containing bank papers, birth certificates, lawyer paperwork, collectible coins.” Further, Lynch wrote trial counsel expressing his desire that counsel locate the personal items seized from his home. Lynch referenced his “mother’s fireproof safe box,” which contained “many irreplaceable items.”
Lead trial counsel’s testimony shows that he was aware of the lockbox and its location. When questioned about the search warrant, Mr. Figgatt stated that it included a grey lockbox seized from Lynch’s nightstand. Trial counsel did not visit the Sanford Police Department to examine the lockbox. Lynch had written trial counsel asking them to retrieve items from the lockbox, and trial counsel were aware that the lockbox was stored at the Sanford Police Department. Further, Lynch was aware of all of this mitigation evidence because he either knew of its existence or it was his personal property. Consequently, this evidence is not Brady evidence because Lynch and defense counsel were aware of its existence and location and simply did not examine it. This claim lacks merit and the postconviction court properly denied relief. See Maharaj v. State, 778 So.2d 944, 954 (Fla.2000) (“[A] Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.” (quoting Occhicone v. State, 768 So.2d 1037, 1042 (Fla.2000))).
ii. Giglio
To establish a Giglio violation, a defendant must demonstrate that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. See Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Giglio claims present mixed questions of law and fact. See Sochor, 883 So.2d at 785. We thus defer to those factual findings supported by competent, substantial evidence, but review de novo related questions of law. See id. In this case, the State’s penalty-phase mental-health expert, Dr. William Riebsame, testified that Lynch was a fairly bright individual who did well in school, except for some problems in mathematics, and that he withdrew *84 from school during the eleventh grade due to fears of school violence and his desire to earn money. During the postconviction hearing, Dr. Riebsame conceded that based upon the school records postconviction counsel provided him, Lynch did not do so well in school and had, in fact, failed a number of courses during his high-school years. However, Lynch neglects to include the detail that Dr. Riebsame was merely repeating what Lynch had self-reported concerning his academic performance. Therefore, Dr. Riebsame’s testimony was not false, as he couched his evaluation in terms of what Lynch concededly self-reported during his December 5, 2000, interview.
Lynch also contends that the prosecutor knew of the falsity of Dr. Rieb-same’s testimony because he had Lynch’s school records in his case file during the penalty-phase proceedings, and that the prosecutor failed to correct Dr. Riebsame. However, even if this assertion is accurate, Lynch cannot establish that he suffered any prejudice. “Under Giglio, false testimony is material if there is a reasonable possibility” .that it could have affected the judgment of the factfinder. See Guzman v. State, 941 So.2d 1045, 1049-50 (Fla.2006); Guzman v. State, 868 So.2d 498, 507-08 (Fla.2003). First, Lynch knew that he had failed several courses during the eleventh grade and he chose not to alert his trial counsel, or the court, that Dr. Riebsame’s testimony was “false.” Hence, if the prosecutor failed to correct false testimony, Lynch was complicit in this alleged falsification effort. Second, Lynch’s postconviction mental-health experts testified that his school records corroborated their belief that Lynch suffers from a “mild cognitive impairment.” (Emphasis supplied.) Lynch did not have a prior history of diagnosed mental illness, is of average overall intelligence (IQ of 101— 111), and meticulously planned and executed the murder portion of his murder-suicide plot. Therefore, it is unlikely that revelations of low performance in algebra and mechanical drawing during his junior year of high school during the late 1960s, and information related to poor performance on standardized tests, would have altered the factfinder’s determination that Lynch did not qualify for the statutory mental-health mitigators. The facts of this case simply do not support Lynch’s contention that his mild cognitive impairment was material.
For these reasons, we reject Lynch’s Brady and Giglio claims as unsubstantiated.
F. Habeas Claims
i. The Factual Basis of Lynch’s Guilty Pleas
In his first habeas claim, Lynch asserts that the facts trial counsel proffered during his plea colloquy were legally insufficient to support convictions for (1) armed burglary; (2) kidnapping; and (3) first-degree murder. Therefore, Lynch maintains that appellate counsel rendered ineffective assistance by failing to argue this point during his direct appeal.
Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000); Smith v. State, 400 So.2d 956, 960 (Fla.1981). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of counsel, we must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate *85 process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). In asserting such a claim, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla.1981). Habeas petitioners may not use claims of ineffective assistance of appellate counsel to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). “If a legal issue ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.” Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).
As explained in Parts II.A.i and II.B.i, supra, this claim lacks merit. Trial counsel and Lynch were aware at the time of his plea that the State possessed more than enough evidence to prove Lynch’s guilt for all four counts of the indictment, and the facts elicited during the penalty-phase proceedings establish Lynch’s commission of these offenses. Appellate counsel cannot be ineffective for failing to raise a meritless issue on appeal. See Lawrence v. State, 831 So.2d 121, 135 (Fla.2002); see also Kokal v. Dugger, 718 So.2d 138, 142 (Fla.1998) (“Appellate counsel cannot be faulted for failing to raise a nonmeritorious claim.”). Furthermore, Lynch could have, and actually did, include the substance of this habeas claim in his rule 3.851 motion; therefore, habeas relief is an improper remedy in this instance. See Rutherford, 774 So.2d at 643.
We thus deny relief on Lynch’s first habeas claim.
ii. Alleged Incompetency
Lynch claims that his eventual execution may be unconstitutional due to incompetency. However, he concedes that this claim is not ripe for review because the Governor has not issued his death warrant. Lynch responds that he is merely raising this issue for preservation purposes. We have repeatedly held that no relief is warranted under similar circumstances. See, e.g., Rogers v. State, 957 So.2d 538, 556 (Fla.2007) (concluding that capital-incompetency claim is not ripe for review where the Governor has not signed the defendant’s death warrant); Morris v. State, 931 So.2d 821, 837 n. 15 (Fla.2006) (same); Sireci v. Moore, 825 So.2d 882, 888 (Fla.2002) (same); see also Fla. R.Crim. P. 3.811-3.812.
Thus, Lynch is not entitled to relief on this claim.
iii. Charging Statutory Aggravators in the Indictment
Lynch presented this same constitutional challenge during his direct appeal. With regard to the State’s failure to charge aggravating circumstances in the indictment, we stated:
Appellant’s first claim — that Florida’s death penalty scheme is unconstitutional because it fails to provide notice as to aggravating circumstances — is rejected based on the ruling of Vining v. State, 637 So.2d 921 (Fla.1994). There this Court wrote: “The aggravating factors to be considered in determining the propriety of a death sentence are limited to those set out in section 921.141(5), Florida Statutes (1987). Therefore, there is no reason to require the State to notify defendants of the aggravating factors *86 that it intends to prove.” Vining, 637 So.2d at 928.
Lynch, 841 So.2d at 378; see also Grim v. State, 971 So.2d 85, 103 (Fla.2007) (failure to charge aggravating factors in the indictment does not violate the Florida and United States Constitutions). Further, because Lynch litigated this claim on direct appeal, the instant challenge is procedurally barred. See Grim, 971 So.2d at 103 (“[C]laims raised in a habeas petition which petitioner has raised in prior proceedings and which have been previously decided on the merits in those proceedings are procedurally barred in the habeas petition.” (quoting Porter v. Crosby, 840 So.2d 981, 984 (Fla.2003))).
Accordingly, we deny relief as to this claim.
iv. Cumulative Error
Finally, Lynch contends that the cumulative range of error that occurred during his trial, appeal, and postconviction proceedings unfairly and unconstitutionally dictated the imposition of the death penalty and that he is accordingly entitled to habeas relief. However, we have consistently held that “where individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail.” Griffin v. State, 866 So.2d 1, 22 (Fla.2003); see also Dufour v. State, 905 So.2d 42, 65 (Fla.2005) (“[The appellant] is not entitled to relief on his cumulative error claim because the alleged individual claims of error are all without merit, and, therefore, the contention of cumulative error is similarly without merit.”). All of the claims that Lynch has presented are either procedurally barred or without merit.
Therefore, we deny the requested relief.
III. CONCLUSION
For the reasons provided in our analysis, we affirm the lower court’s denial of Lynch’s rule 3.851 motion and deny the petition for writ of habeas corpus.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which ANSTEAD, J., concurs.
CANADY and POLSTON, JJ., did not participate.

. The trial court recognized in its sentencing order that the murder of Leah Caday (the daughter-victim) was not premeditated but otherwise qualified as first-degree murder based upon the felony-murder rule. Lynch shot and killed Caday in the course of committing a murder (killing Roseanna Morgan, the mother-victim, with premeditated intent), an armed burglary (deception and coercion of Caday to gain entry to the victims' apartment with the intent to commit a murder therein), and a kidnapping (holding Caday at gunpoint for thirty to forty minutes for the purpose of killing Caday's mother, Roseanna Morgan).

. In its sentencing order, the trial court found Lynch guilty of "kidnapping,” as opposed to “armed kidnapping.”

. The trial court considered the kidnapping of Caday and the armed burglary of the victims’ apartment as the additional contemporaneous felonies.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

.In 2006, we renumbered rule 2.160 as rule 2.330. See In re Amendments to Fla. Rules of Jud. Admin., 939 So.2d 966, 1003 (Fla.2006).

. The fact that the indictment charged Lynch with the premeditated murder of Caday is of no moment because "[w]e have previously held that the State may proceed on theories of both premeditated and felony murder when only premeditated first-degree murder is charged and that a special verdict form demonstrating which theory the jury based its verdict on is not required.” Bedford v. State, 589 So.2d 245, 252 (Fla.1991) (citing Young v. State, 579 So.2d 721, 724 (Fla.1991)).

. As explained in Ruiz, the Legislature statutorily abrogated our Delgado decision as applied to burglary offenses committed after February 1, 2000. See Ruiz, 863 So.2d at 1205-12.

. Section 90.507, Florida Statutes (2000), states:
A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person, or the person's predecessor while holder of the privilege, voluntarily discloses or makes the communication when he or she does not have a reasonable expectation of privacy, or consents to disclosure of, any significant part of the matter or communication. This section is not applicable when the disclosure is itself a privileged communication.

. "There is a strong public policy supporting the marital privilege. The courts will not engage in an after-the-fact analysis of whether a statement is ‘incidental to' or 'because of' the marital relationship, because a married couple, and each of them, should be secure in the knowledge that their private communications are exactly that — private.” Jackson v. State, 603 So.2d 670, 671 (Fla. 4th DCA 1992) (citations omitted) (citing Smith v. State, 344 So.2d 915, 919 (Fla. 1st DCA 1977)).

. Consent is a recognized exception to the Fourth Amendment warrant requirement. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

. A late nineteenth-century children’s novel by Frances Hodgson Burnett about an American-born commoner of noble lineage who eventually becomes a British aristocrat and reconciles his American mother with his grandfather, a British earl.

. The State is correct that “ex parte ” is a misnomer in this context and that in camera is the proper terminology. See Black’s Law Dictionary 775 (8th ed.2004) (“in camera inspection. A trial judge's private consideration of evidence.”).

. Attorney Norgard stated that he has testified as an expert witness in approximately fifteen capital cases.