# Third District Court of Appeal

## State of Florida

Opinion filed June 20, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-1647
Lower Tribunal No. 10-1742
_____


**Carlos G. Bertonatti,**
Appellant,

vs.

**The State of Florida,**
Appellee.


An Appeal under Florida Rule of Appellate Procedure 9.141(b)(2) from the Circuit Court for Miami-Dade County, Victoria Del Pino, Judge.

Fischer Redavid PLLC, and Jordan Redavid, for appellant.

Pamela Jo Bondi, Attorney General, and Nikole Hiciano, Assistant Attorney General, for appellee.


Before ROTHENBERG, C.J., and SALTER and LUCK, JJ.

ROTHENBERG, C.J.

Carlos G. Bertonatti ("Bertonatti") appeals the trial court's order denying his

motion to vacate his guilty plea to: (1) one count of manslaughter while driving under the influence and failing to render aid, a first degree felony; (2) two counts of resisting a law enforcement officer without violence, first degree misdemeanors; and (3) one count of fleeing or attempting to elude a law enforcement officer where lights and sirens had been activated, a third degree felony, which was filed pursuant to Florida Rule of Criminal Procedure 3.850 on the basis of ineffective assistance of trial counsel. Because we conclude that Bertonatti has failed to demonstrate a reasonable probability that, but for the claimed errors, he would not have pled guilty and would have insisted on going to trial, we affirm. See Grosvenor v. State, 874 So. 2d 1176, 1181 (Fla. 2004).

## Summary of the Evidence

At approximately 8:00 a.m., Bertonatti veered his vehicle into the bicycle lane on Bearcut Bridge; struck and killed a bicyclist, Christophe Lecanne; failed to stop or attempt to render aid to Mr. Lecanne; and subsequently fled from the police when they pursued and tried to stop him with lights and sirens activated. The evidence revealed that the impact to the bicycle and to Mr. Lecanne was "horrific." When Bertonatti's vehicle struck Mr. Lecanne's bicycle, Mr. Lecanne was ejected, and his airborne body struck Bertonatti's vehicle itself, bounced, and then impacted the vehicle again before finally being thrown to the pavement. The hood of Bertonatti's vehicle was damaged and the front windshield was shattered by the

2

impact of Mr. Lecanne's body. Mr. Lecanne's bicycle, which became lodged under the grill of the vehicle, was dragged two-and-one-half miles, making what was described by the witnesses as an "ungodly, loud scraping metal sound." Witnesses also described Bertonatti's attempts to dislodge the bicycle by making zigzag maneuvers with his vehicle. Mr. Lecanne, who was being attended to by civilian witnesses, died on the scene from grievous wounds.

Based on the numerous calls to the police by witnesses of Bertonatti's flight, law enforcement immediately responded and began pursuing Bertonatti with lights and sirens activated. Instead of stopping, Bertonatti increased his speed and fled from law enforcement, almost striking slower-moving vehicles along the ten-mile flight to his residence, where he was finally apprehended. Upon law enforcement's contact with Bertonatti, he exhibited all of the indicia of impairment. He had bloodshot watery eyes, his face was flushed, and his breath smelled of alcohol. When asked to perform the standard field sobriety exercises, Bertonatti agreed to do them and told Officer Slimack that he "had a few drinks and I'm taking some Tylenol stuff, everything was blurry." Officer Slimack testified that Bertonatti performed the field sobriety exercises "shockingly poorly" and that he was "very, very impaired."

After Bertonatti was transported to a fire station to withdraw his blood, he became very hostile. He refused to exit the transport vehicle and had to be

3

physically removed. He refused to cooperate with the blood draw and had to be strapped to a board to allow collection of his blood. The toxicology evidence revealed that Bertonatti's blood alcohol level was .122 at approximately one hour after he struck and killed Mr. Lecanne. The evidence also revealed that Bertonatti was at a nightclub for several hours where he had purchased several alcoholic drinks and was on his way home when his vehicle struck Mr. Lecanne on his bicycle.

Prior to trial, Bertonatti informed his lawyers and the trial court that he did not wish to go to trial. Bertonatti's lawyers then informed the trial court that although they had been unsuccessful in reaching a negotiated plea to resolve the case with the State, Bertonatti, however, wished to enter an open plea of guilty to the charges and, after presenting mitigating evidence, to allow the trial court to determine the appropriate sentence. On February 12, 2013, the trial court conducted a preliminary colloquy of Bertonatti. Specifically, the trial court asked Bertonatti if he needed additional time to speak to his attorneys about any issue regarding his case and his decision to plead guilty to the charges. Bertonatti assured the trial court at least twice that he did not need to speak to his attorneys, and that he had sufficient time to consider his decision, which was made freely, voluntarily, and willfully. Importantly, the trial court told Bertonatti that the matter was going to be reset to allow the victim's family to travel from out of the

country in order to be present for Bertonatti's plea and, thus, his decision to plead guilty was not irrevocable—that his actual plea would be taken on February 19, 2013.

On February 19, 2013, as agreed to by all of the parties and lawyers, Bertonatti formally entered his open plea of guilty to DUI manslaughter failing to render aid, two counts of resisting a law enforcement officer without violence, and fleeing or attempting to elude a law enforcement officer where lights and sirens had been activated. Based upon his plea, the State nolle prossed the charge of leaving the scene of a crash involving death because it would have constituted double jeopardy for Bertonatti to have been convicted of both that offense and DUI manslaughter failing to render aid. Prior to accepting Bertonatti's plea, the trial court conducted a very thorough plea colloquy. The victim's family members addressed the court, Bertonatti addressed the victim's family, and the trial court continued the hearing to allow Bertonatti to present evidence in mitigation for the trial court's consideration before imposing a sentence.

On September 9, 10, and 11, 2013, evidence was presented and arguments were made regarding the appropriate sentence, and on September 12, 2013, the trial court sentenced Bertonatti to twelve years of incarceration followed by two years of community control and eight years of probation and issued a very detailed sentencing order. The sentencing guidelines presented a sentencing range of 11.5

5

to 37 years incarceration.

Thereafter, Bertonatti appealed his convictions and sentence on the basis that his convictions for two counts of resisting a law enforcement officer without violence constituted double jeopardy. Because the record was insufficient to determine whether convictions of these two counts was barred by double jeopardy, this Court affirmed without prejudice for Bertonatti to raise the issue in a postconviction motion. Bertonatti has not pursued this claim. Instead, he filed the instant motion for postconviction relief.

### Bertonatti's Postconviction Claims

Bertonatti moved to vacate his plea based on the following claims of ineffective assistance of counsel: (1) failure to inform him that by pleading guilty he would be waiving his right to seek postconviction DNA testing of the blood samples taken from him; (2) failure to have a DNA testing of his blood samples to determine if they were in fact collections of his blood; and (3) failure to inform the trial court that had Bertonatti's blood been DNA tested, there was a possibility he might have been exonerated. The State filed a response to these claims, and the trial court denied the motion and submitted a detailed order with its findings.

The trial court found that the record conclusively established that Bertonatti knowingly, voluntarily, and intelligently waived his right to DNA testing of his blood; there was independent evidence of Bertonatti's intoxication and impairment

6

without the blood evidence; even if counsel provided ineffective assistance of counsel by failing to DNA test the blood samples, there was no prejudice to Bertonatti in light of the overwhelming evidence of his guilt; and there was no reasonable probability that but for the claimed errors, Bertonatti would not have pleaded guilty to the charges and would have insisted on going to trial. The record and the law support the trial court's findings.

I. Failure to inform Bertonatti that he was waiving postconviction DNA testing

The record reflects that Bertonatti was colloquied by the trial court regarding his waiver of postconviction DNA testing, and thus, any failure by his attorneys to address the issue was cured by the trial court. Although, when the trial court initially asked Bertonatti if he understood that he was giving up his right to have any evidence tested for DNA, and Bertonatti said he "did not know that," he informed the trial court that he still wished to plead guilty and that he did not need any additional time to speak with his attorneys about his waiver. He also stated under oath that he was pleading guilty to the charges (including DUI manslaughter) because he was in fact guilty and that he had sufficient time to discuss his case and the potential defenses to the charges with his attorneys prior to entering his plea:

> THE COURT: Have you had sufficient time to speak with your attorneys regarding your case, all of the factual circumstances of your case and any potential defenses of your case; and your decision to enter a plea in this case?

7

THE DEFENDANT: Yes, I have.

THE COURT: Do you need any additional time to speak to your counsel regarding that decision?

THE DEFENDANT: I don't

. . . .

THE COURT: Sir, do you understand you're giving up the right to have any evidence tested for DNA at this time in exchange for your plea?

THE DEFENDANT: I did not know that. But, okay.

THE COURT: Do you need any additional time to speak to your attorney regarding that?

THE DEFENDANT: No.

THE COURT: Are you pleading guilty because you are in fact guilty?

THE DEFENDANT: Yes.

The trial court additionally went over the rights Bertonatti was giving up by pleading guilty, including the right to make the State prove the charges beyond a reasonable doubt, and the trial court carefully questioned Bertonatti to make sure that he was intelligently, freely, and voluntarily giving up these rights. The record, therefore, establishes that when Bertonatti entered his plea, he was fully aware that he was giving up his right to have his blood DNA tested and to require the State to prove the accuracy and reliability of the toxicology results.

8

## II. Failure to have the blood DNA tested

Bertonatti claims that his attorneys provided ineffective assistance of counsel by failing to have the blood draws that were relied on by the State tested to determine if they were in fact the blood drawn from his body on the morning of the crash. Essentially, this argument is a chain of custody argument.

To obtain relief on a claim of ineffective assistance of counsel, a defendant must first identify specific acts or omissions of counsel that are "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). Next the defendant must establish prejudice by demonstrating a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. Further, because this was a plea, as opposed to a conviction after a trial, under the prejudice prong of the analysis, Bertonatti must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Lynch v. State, 2 So. 3d 47, 57 (Fla. 2008) (holding that unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable).

9

Because Bertonatti has failed to meet his burden of establishing prejudice, we need not and do not address the deficient performance prong of the analysis. As to prejudice, we note the following. DUI manslaughter may be proven by either establishing that the defendant was driving or in actual physical control of a vehicle: (1) while "under the influence of alcoholic beverages . . . to the extent that the person's normal faculties are impaired," § 316.193(1)(a), Fla. Stat.; or (2) while having "a blood-alcohol level of 0.08 or more grams of alcohol per 100 milliliters of blood," § 316.193(1)(b).

The evidence in this case reflects that the State did not need to rely on the blood alcohol results to convict Bertonatti of DUI manslaughter failing to render aid. The evidence, even without the blood alcohol evidence, was overwhelming. The incident occurred shortly after 8:00 a.m. on a Sunday morning while Bertonatti was attempting to make it home after spending several hours in a club. While driving on Bearcut Bridge, on a sunny clear day, Bertonatti swerved off the roadway into the bike path; struck the victim, who was riding his bicycle, with such force that the victim's body became airborne and struck the hood and roof of Bertonatti's vehicle, shattering the front windshield, before finally bouncing off Bertonatti's vehicle and hitting the pavement. Instead of stopping to render aid, Bertonatti kept driving while dragging the bicycle under the front grill of his vehicle for nearly three miles before he was able to dislodge the bicycle. He then

10

continued to drive several more miles, nearly striking other vehicles along the way, and accelerating when the police, with sirens and lights activated, tried to pull him over. When he was eventually apprehended by the police, he exhibited all of the signs of being under the influence of alcohol and of impairment. He had bloodshot watery eyes, a flushed face, a strong odor of alcohol on his breath, and he failed every one of the roadside sobriety exercises. Officer Slimack testified that Bertonatti performed these exercises "shockingly poorly" and that he was "very, very impaired." These observations were confirmed by Detective Khan, the traffic homicide investigator, nearly three hours later.

Additionally, Bertonatti told Officer Slimack that he had "a few drinks and I'm taking some Tylenol stuff, everything was blurry." A receipt from the club reflected that Bertonatti had purchased several alcoholic beverages while there. There were also numerous eyewitnesses. These witnesses were listed by the State and deposed by defense counsel.

As the above recitation of the evidence clearly reflects, there was an abundance of evidence from which a jury could have found beyond all reasonable doubt that Bertonatti was under the influence of alcoholic beverages to the extent that his normal faculties were impaired when he swerved into the bike lane, struck the victim, and continued to drive erratically. Specifically, Bertonatti's breath smelled of alcohol, he failed the roadside sobriety exercises, and he exhibited all of

11

the usual signs and characteristics of intoxication.

We additionally note that Bertonatti was also charged with leaving the scene of an accident involving death. The State nolled prossed that charge on double jeopardy grounds after Bertonatti pled guilty to DUI manslaughter failing to render aid. Had Bertonatti proceeded to trial, the State would have presented both charges to the jury and if the State was unable to prove either that Bertonatti had a blood alcohol level of 0.08 or higher or that he was under the influence of alcohol to the extent his normal faculties were impaired, then the State would have relied on the alternate charge of leaving the scene of an accident involving death. Since both offenses are first degree felonies punishable by thirty years of incarceration, a conviction as to either would have subjected Bertonatti to the same punishment.

It is therefore clear that Bertonatti failed to establish prejudice as there is no reasonable probability that but for the claimed errors, he would not have pled guilty and would have instead elected to go to trial. Hill, 474 U.S. at 59; see also Grosvenor, 874 So. 2d at 1181-82 (holding that when determining whether a reasonable probability exists that the defendant would have insisted on going to trial, the court should consider the totality of the circumstances surrounding the plea, including whether a particular defense was likely to succeed at trial, the colloquy between the defendant and the trial court, and the difference between the sentence imposed and the maximum sentence the defendant was facing if he went

12

to trial).

Based on the totality of the circumstances, the overwhelming evidence of guilt as to impairment and the alternate charge of leaving the scene of an accident involving death, and the difference between the twelve year sentence imposed versus the possibility of a thirty-seven year sentence, we conclude that there is objectively no reasonable probability that if Bertonatti's blood had been DNA tested, it would have had any bearing on whether Bertonatti would have elected to go to trial.  See Hill, 474 U.S. at 60 (emphasizing that this determination should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker") (internal quotation omitted).

III. Failure to inform the trial court that had Bertonatti's blood been tested there was a possibility he might be exonerated

This claim has no merit.  Bertonatti's appellate postconviction counsel contends that Bertonatti's trial counsel should have informed the trial court during the plea colloquy that he had not requested any DNA testing for Bertonatti's blood samples to verify that they actually belonged to Bertonatti.  This claim is without merit because the trial court was made aware during the plea colloquy that Bertonatti's blood samples had not been DNA tested, and as already addressed, the trial court colloquied Bertonatti to make sure that he was aware that he was giving up his right to have the blood samples DNA tested by pleading guilty to the charges.  Although appellate counsel speculates that DNA testing **might** have

13

exonerated Bertonatti, there is no evidence to support his speculation. In fact, the evidence refutes such speculation.

First, there is the overwhelming evidence of Bertonatti's intoxication. Second, there is no evidence of tampering or mishandling of the blood evidence, which is well-documented by the chain of custody evidence. Third, Bertonatti himself confirmed that he had been drinking and that he was guilty of the charges. Fourth, even without consideration of the blood evidence, Bertonatti would not have been "exonerated" as he was clearly under the influence of alcohol to the extent his normal faculties were impaired when he struck and killed Mr. Lecanne, failed to stop and render aid, and/or left the scene of an accident involving death.

### Conclusion

Based on the record evidence, which includes a great deal of discovery, a very thorough colloquy by the trial court, and Bertonatti's own admissions, we affirm the trial court's equally thorough and well-articulated order denying Bertonatti's motion for postconviction relief.

Affirmed.

14